[No. 85784-9.   En Banc.]
Argued February 16, 2012.    Decided January 31, 2013.

BRANDON APELA AFOA, *Respondent*, v. THE PORT OF SEATTLE, *Petitioner*.

*Mark S. Northcraft* (of *Northcraft Bigby & Biggs PC*), for petitioner.

*Raymond E.S. Bishop* and *Derek K. Moore* (of *Bishop Law Offices PS*) and *Michael T. Schein* (of *Sullivan Law Firm*), for respondent.

*Kristopher I. Tefft* on behalf of Washington Retail Association and Association of Washington Business, amici curiae.

*Brandi L. Ross* on behalf of Washington Public Ports Association, amicus curiae.

*Arthur M. Fitzpatrick* on behalf of City of Kent, amicus curiae.

*Peter J. Kirsch, W. Eric Pilsk,* and *Monica Hargrove* on behalf of Airports Council International—North America, amicus curiae.

*Bryan P. Harnetiaux* and *George M. Ahrend* on behalf of Washington State Association for Justice Foundation, amicus curiae.

*Anastasia R. Sandstrom, Assistant Attorney General,* on behalf of Department of Labor & Industries, amicus curiae.

¶1 WIGGINS, J. — Should we extend to the Port of Seattle (Port), which owns and operates Seattle-Tacoma International Airport (Sea-Tac Airport), the principles of liability imposed on other entities that control the common area of a multiemployer workplace? Brandon Afoa was paralyzed in an accident while he was working at Sea-Tac Airport and seeks to recover from the Port on three theories we have applied in other multiemployer workplace cases: as a business invitee; for breach of safety regulations under the Washington Industrial Safety and Health Act of 1973 (WISHA), chapter 49.17 RCW; and the duty of a general contractor to maintain a safe common area for any employee of subcontractors. We conclude that the same principles that apply to other multiemployer workplaces apply to Sea-Tac Airport and that a jury could find the Port liable under any of these three theories. We affirm the Court of Appeals, which reversed the trial court's summary judgment dismissing Afoa's claims, and remand for further proceedings.

## FACTS

¶2 Brandon Afoa was severely injured while working at Sea-Tac Airport. He was driving a powered industrial

vehicle called a "tug" or "pushback" that moves airplanes to and from passenger gates. As he drove the tug/pushback toward gate S-16, he lost control of the vehicle and yelled for help. He crashed into a "K-loader," a large piece of loading equipment that fell on him, causing severe injuries. The parties dispute the cause of the accident.

¶3 Afoa filed suit against the Port in King County Superior Court, alleging that the Port failed to maintain safe premises and violated common law and statutory duties to maintain a safe workplace. The Port moved for summary judgment, arguing it had no duty to Afoa because Afoa was not the Port's "employee."

¶4 Indeed, the Port and Afoa do not enjoy a direct employer-employee relationship. Afoa works for Evergreen Aviation Ground Logistics Enterprises Inc. (EAGLE), which contracts with airlines to provide ground services such as loading and unloading. The Port does not employ EAGLE or contract for its services, but EAGLE nevertheless must obtain a license from the Port before it can work on the premises.

¶5 Although the Port does not employ Afoa or EAGLE, Afoa alleges that the Port controls the manner in which he performs his work at Sea-Tac Airport. First, he claims the Port retains control over the "Airfield Area" (where the accident allegedly took place) in its lease agreement with the airlines, which grants the airlines use of the Airfield Area "subject at all times to the exclusive control and management by the Port." Clerk's Papers (CP) at 274. Second, Afoa claims the Port retains control through its license agreement with EAGLE, which requires EAGLE to abide by all Port rules and regulations and allows the Port to inspect EAGLE's work. The agreement also disclaims liability for accidents and equipment malfunctions. Finally, Afoa claims the Port retains control over EAGLE by the Port's conduct. He specifically claims that the Port continuously controls and supervises the actions of EAGLE and its employees and that the Port previously asserted control over tug/pushback brake

maintenance following an incident that was similar to, and three months before, Afoa's accident.

¶6 The Port moved for summary judgment, arguing that none of Afoa's claims were viable because neither Afoa nor EAGLE was the Port's employee, but instead EAGLE was a licensee and the Port a licensor.

¶7 The trial court granted the Port's summary judgment motion, dismissing Afoa's claims. The Court of Appeals reversed, holding that all of Afoa's claims were viable and that summary judgment was inappropriate because all of Afoa's claims hinged on genuine issues of material fact. *Afoa v. Port of Seattle*, 160 Wn. App. 234, 247 P.3d 482 (2011). We granted review to decide whether summary judgment was appropriate and to examine these important issues of workplace safety. *Afoa v. Port of Seattle*, 171 Wn.2d 1031, 257 P.3d 664 (2011).

## STANDARD OF REVIEW

¶8 We review summary judgment motions de novo, engaging in the same inquiry as the trial court. *City of Sequim v. Malkasian*, 157 Wn.2d 251, 261, 138 P.3d 943 (2006). Summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Id.* We consider all disputed facts in the light most favorable to the nonmoving party, and summary judgment is appropriate only if reasonable minds could reach but one conclusion. *Dowler v. Clover Park Sch. Dist. No. 400*, 172 Wn.2d 471, 484, 258 P.3d 676 (2011). Finally, summary judgment is inappropriate where the existence of a legal duty depends on disputed material facts. *Sjogren v. Props. of Pac. Nw., LLC*, 118 Wn. App. 144, 148, 75 P.3d 592 (2003).

## ANALYSIS

¶9 We hold that there are genuine issues of material fact precluding summary judgment on all three of Afoa's claims

against the Port. We analyze each claim in turn—premises liability; Afoa's statutory claim under WISHA, chapter 49.17 RCW; and the duty of certain parties in control of a common work area to provide adequate safety precautions. For all three claims, the Port potentially owed a duty to Afoa, and genuine factual issues preclude summary judgment. Accordingly, we affirm the Court of Appeals on all three issues.

I.   Afoa's premises liability claim is potentially viable; Afoa is a business invitee, and there are triable issues of fact whether the Port breached its corresponding duty to Afoa

¶10 Afoa and the Port dispute Afoa's status and standard of care under Afoa's theory of premises liability. Under common law premises liability, a landowner owes differing duties to entrants onto land depending on the entrant's status as a trespasser, a licensee, or an invitee. *Iwai v. State*, 129 Wn.2d 84, 90-91, 915 P.2d 1089 (1996). We hold that Afoa is a business invitee. We also affirm the Court of Appeals' reversal of summary judgment because there are genuine issues of material fact on this claim.

¶11 A "business invitee" is a person who is " 'invited to enter or remain on land for a purpose directly or indirectly connected with business dealings with the possessor of the land.' " *Younce v. Ferguson*, 106 Wn.2d 658, 667, 724 P.2d 991 (1986) (quoting RESTATEMENT (SECOND) OF TORTS § 332(3) (1965)). An invitation can be either express or implied permission gathered from the words or conduct of the landowner. *See* RESTATEMENT (SECOND) OF TORTS § 332 cmt. c.

¶12 In contrast, a "licensee" is " 'a person who is privileged to enter or remain on land only by virtue of the possessor's consent.' " *Younce*, 106 Wn.2d at 667 (quoting RESTATEMENT (SECOND) OF TORTS § 330). This includes social guests and others invited onto the land who do not meet the legal definition of an "invitee." *Id.*

■ ¶13  Our premises liability analysis cannot begin and end with the fact that the Port has labeled its contract with Afoa's employer EAGLE as a "license." Instead, we must look at the substance of the relationship to determine Afoa's status.

■■ ¶14  Afoa was plainly a business invitee because he was on the premises for a purpose connected to business dealings with the Port. There is simply no genuine dispute in the record on this point. The Port is in the business of running an airport, and Afoa was doing airport work. Indeed, he was doing work (loading and unloading airplanes) without which Sea-Tac Airport could not operate. Afoa was unquestionably on the premises for a purpose connected to business, so he is a business invitee. On this record, no reasonable jury could find otherwise.

¶15  The Port's two arguments to the contrary are unpersuasive. First, the Port claims it did not "invite" Afoa onto the premises, so he cannot be a business invitee. This argument is flawed because the Port confuses the common law term of art with social convention. At common law, an invitation can consist of any words or conduct "which justifies others in believing that the possessor desires them to enter the land . . . ." RESTATEMENT (SECOND) OF TORTS § 332 cmts. b, c. Here, the Port licensed EAGLE to enter the premises to perform specific tasks, expressly contemplating that EAGLE's employees would perform those tasks. This is the essence of an invitation. The Port licensed EAGLE to contract with airlines knowing that EAGLE's work would take place on the premises. The Port's conduct justifies EAGLE in thinking its entry was desired, so the Port's claim that it did not invite EAGLE onto the premises is unavailing. Furthermore, EAGLE can be physically present at Sea-Tac Airport only in the form of its employees, so its employees are clearly within the scope of the invitation.

¶16  Second, the Port argues that Afoa is not an invitee because there was no " ' "mutuality of interest." ' " Pet. for Discretionary Review at 18 (quoting *Thompson v. Katzer*, 86

Wn. App. 280, 286-87, 936 P.2d 421 (1997) (quoting *Enersen v. Anderson,* 55 Wn.2d 486, 488, 348 P.2d 401 (1960))). *Thompson* considered "mutuality of interest" as a factor in distinguishing between a business invitee and a social guest; here, in contrast, it is clear that Afoa was not a social guest. In any event, the record in this case plainly establishes mutuality of interest. The Port unquestionably has an interest in having work done by contractors like EAGLE: The Port operates a complex commercial enterprise from which it substantially benefits and contractors like EAGLE are part of that enterprise. The Port's second argument also fails.

¶17 As a matter of law, Afoa is a business invitee.

¶18 Having established this, we further conclude that there are genuine issues of material fact about whether the Port breached its duty to Afoa. Because Afoa was an invitee, the Port owed him a duty to prevent "harm caused by an open and obvious danger" if it "should have anticipated the harm, despite the open and obvious nature of the danger." *Kamla v. Space Needle Corp.,* 147 Wn.2d 114, 126, 52 P.3d 472 (2002). Afoa presents record evidence of such a danger; he claims there was clutter in his work area—in particular the broken-down K-loader that fell on him. Afoa submitted an aerial photograph and declaration suggesting that his injury resulted from this clutter. The Port did not rebut this evidence, so there is a genuine issue for the fact-finder about whether the Port breached its premises liability duty. Thus, we affirm the Court of Appeals' reversal of summary judgment.

II.  Afoa has a potentially viable WISHA claim, and there are triable issues of fact regarding that claim

¶19 Turning to Afoa's claim that the Port had a statutory duty to comply with WISHA regulations, we hold that the Port may indeed have had a duty under WISHA, and again factual issues preclude summary judgment. Accordingly, we affirm the Court of Appeals.

A. Jobsite owners such as the Port have a statutory duty to prevent WISHA violations if they retain control over work done on a jobsite

¶20 Our legislature passed WISHA in 1973 to ensure worker safety and supplement the federal Occupational Safety and Health Act of 1970 (OSHA), 29 U.S.C. §§ 651-678. *See* ch. 49.17 RCW; *SuperValu, Inc. v. Dep't of Labor & Indus.*, 158 Wn.2d 422, 425, 144 P.3d 1160 (2006). OSHA requires states to comply with its rules or else enact safe workplace standards at least as effective as OSHA in ensuring worker safety. 29 U.S.C. § 667(c)(2); *SuperValu*, 158 Wn.2d at 425. In addition, our constitution requires the legislature to "pass necessary laws for the protection of persons working in mines, factories and other employments dangerous to life or deleterious to health." WASH. CONST. art. II, § 35.

¶21 WISHA directs our Department of Labor and Industries to promulgate regulations that equal or exceed standards promulgated under OSHA. RCW 49.17.010, .040. WISHA's purpose is to assure "safe and healthful working conditions for every man and woman working in the state of Washington" and to "create, maintain, continue, and enhance the industrial safety and health program of the state." RCW 49.17.010.

¶22 Under WISHA, and in particular RCW 49.17-.060, employers must comply with two distinct duties:

Each employer:

(1) Shall furnish to each of his or her employees a place of employment free from recognized hazards that are causing or likely to cause serious injury or death to his or her employees: PROVIDED, That no citation or order assessing a penalty shall be issued to any employer solely under the authority of this subsection except where no applicable rule or regulation has been adopted by the department covering the unsafe or unhealthful condition of employment at the workplace; and

(2) Shall comply with the rules, regulations, and orders promulgated under this chapter.

RCW 49.17.060.[1]

¶23 These two distinct duties arise from RCW 49.17-.060's two subsections. *See Goucher v. J.R. Simplot Co.*, 104 Wn.2d 662, 671, 709 P.2d 774 (1985). Subsection (1) creates a " 'general duty' " to maintain a workplace free from recognized hazards; this duty runs only from an employer to its employees. *Id.* Subsection (2), on the other hand, creates a " 'specific duty' " for employers to comply with WISHA regulations. *Id.* Unlike the general duty, the specific duty runs to *any* employee who may be harmed by the employer's violation of the safety rules. *Id.*; *see also Stute v. P.B.M.C., Inc.*, 114 Wn.2d 454, 460, 788 P.2d 545 (1990). We adopted this rule in *Goucher* and *Stute*, relying on the Sixth Circuit Court of Appeals' decision in *Teal v. E.I. DuPont de Nemours & Co.*, 728 F.2d 799 (6th Cir. 1984). That case interpreted the parallel clause in OSHA as extending the specific duty to all employees on the work site who may be affected by work safety violations, irrespective of any employer-employee relationship. *Id.* at 804-05.

---

[1] WISHA defines "employer" and "employee" broadly:

The term "employer" means any person, firm, corporation, partnership, business trust, legal representative, or other business entity which engages in any business, industry, profession, or activity in this state and employs one or more employees or who contracts with one or more persons, the essence of which is the personal labor of such person or persons and includes the state, counties, cities, and all municipal corporations, public corporations, political subdivisions of the state, and charitable organizations: PROVIDED, That any person, partnership, or business entity not having employees, and who is covered by the industrial insurance act shall be considered both an employer and an employee.

RCW 49.17.020(4).

The term "employee" means an employee of an employer who is employed in the business of his or her employer whether by way of manual labor or otherwise and every person in this state who is engaged in the employment of or who is working under an independent contract the essence of which is his or her personal labor for an employer under this chapter whether by way of manual labor or otherwise.

RCW 49.17.020(5).

¶24 But even the specific duty does not create per se liability for anyone deemed an "employer." In *Kamla*, we held that although general contractors and similar employers *always* have a duty to comply with WISHA regulations, the person or entity that owns the jobsite is not per se liable for WISHA violations. *Kamla*, 147 Wn.2d at 125. Rather, jobsite owners have a duty to comply with WISHA only if they retain control over the manner in which contractors complete their work. *Id.* This rule recognizes the reality that not all jobsite owners are similarly knowledgeable about safety standards within a given trade. *Id.* at 124.

¶25 Our holding in *Kamla* is consistent with the federal "multi-employer workplace rule." *See* Amicus Curiae Br. by Wash. State Dep't of Labor & Indus. at 7. Under that rule, an employer who controls or creates a workplace safety hazard may be liable under OSHA even if the injured employees work only for a different employer. *See Martinez Melgoza & Assocs. v. Dep't of Labor & Indus.*, 125 Wn. App. 843, 848-49, 106 P.3d 776 (2005) (citing OSHA cases). And certainly, as a matter of federal law, WISHA protections must equal or exceed OSHA standards. 29 U.S.C. § 667(c)(2); *SuperValu*, 158 Wn.2d at 425.

¶26 In sum, it is settled law that jobsite owners have a specific duty to comply with WISHA regulations if they retain control over the manner and instrumentalities of work being done on the jobsite. Further, this duty extends to all workers on the jobsite that may be harmed by WISHA violations.

B.   Contrary to the Port's assertions, a jobsite owner's specific duty does not depend on the existence of a direct employment relationship

¶27 Turning to the specific issue presented by this case, the Port argues that it owes Afoa no duty to comply with WISHA regulations because its relationship with EAGLE and Afoa is not that of an employer and employee. Instead, the Port claims it is only a licensor and EAGLE is a licensee.

¶28 We reject the Port's argument, which is inconsistent with our holdings in *Goucher* and *Stute*. As we made clear in those cases, the specific duty to prevent WISHA violations does not run only to the principal's employees, but to all workers on the work site who may be harmed by WISHA violations. *Goucher*, 104 Wn.2d at 671; *Stute*, 114 Wn.2d at 460. No employer-employee relationship is required, so it makes no difference if the Port labels itself a licensor and EAGLE a licensee.

¶29 In addition, the express language of WISHA undermines the Port's argument. Subsection (2) imposes the specific duty on "employers," which is defined broadly. *See* RCW 49.17.020(4). The Port easily falls within this definition. Likewise, Afoa easily falls within the definition of an "employee." *See* RCW 49.17.020(5). Thus, even if Afoa is not *the Port's* employee, the Port is an "employer" and Afoa is an "employee" under the statute. That is all WISHA requires for a specific duty to arise. *See* RCW 49.17.060(2).

¶30 We reaffirm *Goucher* and *Stute* and hold that WISHA's specific duty does not require a direct employment relationship. To read the statute in any other way would contravene both federal law and WISHA's clearly articulated policy of protecting workplace safety. *See* RCW 49.17.010. An employee's WISHA claim is not defeated as a matter of law merely because that employee is labeled a "licensee."

¶31 The dissent argues that prior to this decision "there was no broad rule applying to all situations where a landowner with employees on the property must comply with specific duties to another employer's employees." Dissent at 497. This decision does not establish any "broad rule applying to all situations." We hold only that jobsite owners must comply with WISHA regulations if they retain control over the manner and instrumentalities of work done at the jobsite.

¶32 The dissent expresses concern that WISHA duties should be limited to "the employment situation," either

direct employment or employer-subcontractor relationships. *Id.* We have not previously so limited WISHA duties. Indeed, in our seminal decision in *Goucher*, we held that a landowner owed WISHA duties to a truck driver making a delivery to the landowner. 104 Wn.2d at 673. The Port operates a major airport facility, is responsible for its own employees, and allows controlled access to thousands of employees of other employers. Under these circumstances, the Port is closely analogous to a general contractor.

C.  There are genuine issues of material fact whether the Port retained sufficient control over EAGLE and Afoa that it took on a duty to prevent WISHA violations

¶33 The extent of the Port's control over EAGLE and Afoa is a genuine dispute over a material fact. On the summary judgment record, some facts suggest the Port retained very little control: the Port's licensing agreement disclaims any liability for EAGLE's equipment and states that all equipment is the sole responsibility of EAGLE. On the other hand, some facts suggest the Port retained substantial control. For example, the Port retains "exclusive control" over the Airfield Area where the accident may have taken place. CP at 274. In addition, three months before Afoa's accident, the Port responded to a similar tug/pushback brake failure incident by suspending a driver's license, requesting an "emphasis briefing" on the importance of vehicle inspections, and requiring verification of complete braking system repair before the tug/pushback could return to service. *Id.* at 366-70. Viewing the record in the light most favorable to Afoa, it is evident that reasonable minds could reach different conclusions on the question of the Port's control. There is thus a genuine factual issue best resolved in the trial court. We affirm the Court of Appeals' reversal of summary judgment on this issue.

III. The Port may have had a common law duty to maintain safe common work areas, and there are triable issues of fact on this issue precluding summary judgment

¶34 Under our common law safe workplace doctrine, landowners and general contractors that retain control over a work site have a duty to maintain safe common work areas. *Kelley v. Howard S. Wright Constr. Co.*, 90 Wn.2d 323, 331-32, 582 P.2d 500 (1978); *Kamla*, 147 Wn.2d at 121-22.

¶35 The Port makes a novel argument that it need not comply with this rule because it is merely a licensor, not a general contractor. We reject the Port's argument, looking beyond mere labels and considering the principles and policies that underlie our doctrine. We hold that the Port may have had a duty to maintain safe common work areas and that the existence of this duty depends on factual issues best resolved at trial; accordingly, we affirm the Court of Appeals' reversal of summary judgment.

A. Landowners and general contractors that retain control over workplace safety have a common law duty to keep common work areas safe for all workers

¶36 Historically, our common law workplace safety doctrine has its roots in the master-servant relationship. At common law, a "master" has a duty to its "servant[s]" to maintain a reasonably safe place to work. *Myers v. Little Church by Side of Rd.*, 37 Wn.2d 897, 901-02, 227 P.2d 165 (1951) (citing *Nordstrom v. Spokane & Inland Empire R.R.*, 55 Wash. 521, 104 P. 809 (1909)).

¶37 Over time, we have expanded the doctrine beyond the narrow confines of the master-servant relationship.

¶38 Our seminal case in this area is *Kelley*, 90 Wn.2d 323, a unanimous opinion authored by Justice Horowitz that elevates concern for worker safety over rigid adherence

to formalistic labels and emphasizes this court's central role in ensuring the safety of our state's workers.

¶39 The facts of *Kelley* are straightforward. Defendant Howard S. Wright Construction was a general contractor hired to build the Bank of California Center in Seattle. *Id.* at 326. Wright contracted with H.H. Robertson to install metal decking on the building, and H.H. Robertson hired the plaintiff, Edward Kelley. *Id.* Kelley was severely injured when he fell from a slippery beam 36 feet above the ground while laying decking panel on a rainy day. *Id.* Wright had not installed a safety net or required workers to use safety lines. *Id.* Kelley sued Wright, alleging Wright violated its duty to maintain a safe workplace. *Id.* at 327. Wright, much like the Port here, argued that it had no duty to provide a safe workplace for Kelley because it was not his employer, i.e., there was no master-servant relationship. *Id.* at 329.

¶40 Wright's argument relied on the so-called "independent contractor rule." An "independent contractor" is a person who " 'contracts with another to do something for him but who is not controlled by the other nor subject to the other's right to control with respect to his physical conduct in the performance of the undertaking.' " *Kamla*, 147 Wn.2d at 119 (quoting RESTATEMENT (SECOND) OF AGENCY § 2(3) (1958)). At common law, a principal who hires an independent contractor is not liable for harm resulting from the contractor's work. *Tauscher v. Puget Sound Power & Light Co.*, 96 Wn.2d 274, 277, 635 P.2d 426 (1981). In particular, the principal has no duty to maintain a safe workplace for a contractor's employees and is not liable for their injuries. *Id.*

¶41 In essence, Wright asked us to limit the safe workplace duty to an employer's direct employees and not extend it to independent contractors and other workers on the work site.

¶42 We refused to so limit the doctrine. Instead, we imposed a safe workplace duty irrespective of the precise contractual relationship between the parties. *Kelley*, 90

Wn.2d at 330. We held that where a principal retains control over "some part of the work," we disregard the "independent contractor" designation and require the principal (in *Kelley*, a general contractor) to maintain safe common workplaces for all workers on the site. *Id*. Fundamentally, we reasoned that the safe workplace duty cannot be avoided by reference to formalistic labels such as "independent contractor" and that the duty must be imposed on the entity best able to prevent harm to workers. *Id*. at 331-32 (citing *Fenimore v. Donald M. Drake Constr. Co.*, 87 Wn.2d 85, 549 P.2d 483 (1976)). We held that the relevant inquiry is whether the principal retained control over the work site, not whether there was a direct employment relationship between the parties. *Id*.

¶43 We clarified the scope of *Kelley* when we analyzed its potential application to a jobsite owner that was not a general contractor in *Kamla*. 147 Wn.2d at 119-20. We strongly suggested that the doctrine is not strictly limited to general contractors on a construction site. *Id*. *Kamla* involved a jobsite owner, the Space Needle, hiring an independent contractor to install a fireworks display on the Space Needle. We held that if a jobsite owner like the Space Needle retained the right to control work, it could be liable under a common law safe workplace theory. *Id*. However, we also held that the Space Needle had not retained sufficient control to give rise to a common law safe workplace duty.[2] *Id*. at 121-22.

¶44 In short, the existence of a safe workplace duty depends on retained control over work, not on labels or contractual designations such as "independent contractor" or "general contractor."

---

[2] In a similar decision issued shortly after *Kamla*, the Court of Appeals held that the Space Needle *had* retained sufficient control over a different contractor such that the Space Needle had a duty to maintain a safe workplace. *Kinney v. Space Needle Corp.*, 121 Wn. App. 242, 85 P.3d 918 (2004). *Kinney* is an application of the rule set forth in *Kamla*.

B. The Port cannot avoid our safe workplace doctrine by referring to formalistic labels; the Port had a duty to maintain safe common areas if it retained control over the manner and instrumentalities of work done by EAGLE and Afoa

¶45 The Port presents a novel argument that our well-established principles of workplace safety should not apply to it. The Port has structured its contracts with workers like EAGLE and Afoa such that those workers are not technically Port employees. Rather, the Port issues licenses to many of the independent contractors working at Sea-Tac Airport, granting them permission to work on the premises and requiring them to comply with all of the Port's safety rules and regulations. The Port argues that the *Kelley* doctrine applies only to general contractors, whereas the Port is a licensor. The Port makes this argument notwithstanding the fact that if everything Afoa alleges is true, as we must assume on a summary judgment motion, the Port appears to exercise nearly plenary control over Sea-Tac Airport and the manner in which work is performed on the premises.

¶46 While the Port's argument is admittedly novel, it is unpersuasive in light of *Kelley* and *Kamla*. *Kelley* does not limit its application to a narrow variant of the employment relation. It does not require a "master" or "servant," an "employer" or "employee," or indeed any specific combination of contractual relationships. *See Kelley*, 90 Wn.2d at 330-31. Instead, *Kelley* and *Kamla* stand for the proposition that when an entity (whether a general contractor or a jobsite owner) retains control over the manner in which work is done on a work site, that entity has a duty to keep common work areas safe because it is best able to prevent harm to workers. *See id.*; *Kamla*, 147 Wn.2d at 119-21.

¶47 Calling the relationship a license does not change reality. If a jury accepts Afoa's allegations, the Port controls

the manner in which work is performed at Sea-Tac Airport, controls the instrumentalities of work, and controls workplace safety. The Port is the only entity with sufficient supervisory and coordinating authority to ensure safety in this complex, multiemployer work site. If the Port does not keep Sea-Tac Airport safe for workers, it is difficult to imagine who will. The Port cannot absolve itself of its responsibility under the law simply by declining to "hire" contractors and instead issuing them licenses.

¶48 Indeed, as *Kelley* makes abundantly clear, the safety of workers does not depend on the formalities of contract language. Instead, our doctrine seeks to place the safety burden on the entity in the best position to ensure a safe working environment. *Kelley*, 90 Wn.2d at 331. Where there are multiple employers performing a variety of tasks in a complex working environment, it is essential that a safe workplace duty be placed on a landlord who retains the right to control the movements of all workers on the site to ensure safety. *Id.* The policy of encouraging a safe workplace is even more urgent in a complex, modern, multi-employer work site like Sea-Tac Airport than in a simpler, more traditional master-servant arrangement.

¶49 We should also encourage employers to implement safeguards against injury. *See Stute*, 114 Wn.2d at 461. We achieve this laudable goal by placing a safe workplace duty on the entity best able to protect workers.

¶50 While there are many compelling policy reasons for holding the Port liable, the Port's only defense to liability is its insistence that contractual formalities must trump workplace safety. Indeed, there is little to the Port's argument beyond the assertion that a license is different from a subcontract. The Port cannot contend that it lacks contractual privity with EAGLE because it contracts directly with EAGLE when it issues licenses. The Port is also mistaken that it does not benefit by EAGLE's services. Without

someone to load and unload airplanes, the airport would be pointless.[3]

¶51 In *Kelley*, we rejected an inflexible approach as inconsistent with the policy behind our workplace safety law. An inflexible approach is also inconsistent with the nature and purpose of the common law. The common law owes its glory to its ability to cope with new situations, and its principles are not mere printed fiats but living tools to be used in solving emergent problems. *Mills v. Orcas Power & Light Co.*, 56 Wn.2d 807, 819, 355 P.2d 781 (1960).

¶52 A more sensible approach is that taken by the Supreme Court of Alaska. In *Parker Drilling Co. v. O'Neill*, 674 P.2d 770, 776 (Alaska 1983), Alaska emphatically rejected any notion that the duty to maintain a safe workplace depends on any particular contractual relationship or label:

> [T]here is a common law duty to provide a safe worksite running to whomever supplies and controls that worksite. This duty protects all workers on the site and not just the employees of the defendant. The duty is not dependent upon the existence of any particular combination of contractual relationships.

Very few jurisdictions take a contrary approach, and those that do have not considered the question in much detail.[4]

---

[3] The dissent argues a variation of the Port's basic premise, stating repeatedly that only a general contractor or direct employer undertakes the duty of providing a safe workplace. Dissent at 485-89, 490-93. We respectfully disagree because a landowner such as the Port can undertake to control a multiemployer workplace as effectively as, or even more effectively than, a general contractor. We decline to insulate such a landowner on the ground that the right of control is incorporated in a "license" rather than a subcontract.

[4] Other than Alaska, no court has addressed this question squarely. A California appeals court stated that the duty to provide a safe workplace extends only to the worker's "immediate employer or those who contract for the services of the immediate employer . . . ." *Lopez v. Univ. Partners*, 54 Cal. App. 4th 1117, 1126, 63 Cal. Rptr. 2d 359 (1997); *see also Waste Mgmt., Inc. v. Superior Court*, 119 Cal. App. 4th 105, 110, 13 Cal. Rptr. 3d 910 (2004) (citing *Lopez* for same). But the California court's statement was dicta because the court resolved the issue on factual grounds, finding that there was no retained control whatsoever. *See Lopez*, 54 Cal. App. 4th at 1126. Likewise, Louisiana and Vermont have held that where there is no employment relation, the only duty a landowner owes comes from the law of

¶53 Although we find the Alaska approach attractive, we decline to adopt it wholesale, instead resolving this case on its facts. Certainly, not every licensor or jobsite owner takes on a common law duty to maintain a safe workplace any time it requires on-site workers to comply with safety rules and regulations. But where a licensor undertakes to control worker safety in a large, complex work site like Sea-Tac Airport and is in the best position to control safety, there is a duty to maintain safe common work areas within the scope of retained control. We recognize that many aspects of this case are unique; the Port operates a highly complex, multiemployer work site and is perhaps the only entity in a position to maintain worker safety. Moreover, the Port has allegedly retained substantial control over the manner in which work is done at Sea-Tac Airport. To the extent other cases arise in the future, liability should depend on similar factors. This narrow holding limits concerns raised by amici that adhering to *Kelley* raises the specter of unintended liability for municipal corporations and other licensors.

¶54 But this holding also recognizes what is fair: that a jobsite owner who exercises pervasive control over a work site should keep that work site safe for all workers, just as a general contractor is required to keep a construction site safe under *Kelley*, and just as a master is required to provide a safe workplace for its servants at common law.

C. If the facts Afoa alleges are true, the Port retained control over workplace safety at Sea-Tac Airport and has a common law duty to keep the workplace safe; accordingly, summary judgment was inappropriate

¶55 The parties dispute how much control the Port retained over the work done at Sea-Tac Airport. Afoa alleges

premises liability, even if the landowner retains some control over safety or work being done on the premises. *Boycher v. Livingston Parish Sch. Bd.*, 96-2766 (La. App. Cir. 1 6/24/98); 716 So. 2d 187, 190-91; *Vella v. Hartford Vt. Acquisitions, Inc.*, 2003 VT 108, 176 Vt. 151, 157, 838 A.2d 126. We already rejected this narrow view of workplace safety in *Kelley*. None of these cases is precisely on point, nor do they contain thorough discussions of the relevant issue.

that the Port retains control over the Airfield Area and that any activity there is "subject at all times to the exclusive control and management by the Port." CP at 274. At oral argument, the Port's attorney conceded that the purpose of the Port's rules and regulations is to control the tarmac. Afoa also alleges the Port retains control through its license agreement with EAGLE, requiring EAGLE to abide by all Port rules and regulations and allowing the Port to inspect EAGLE's work. Finally, Afoa alleges the Port retains control over EAGLE by conduct. He specifically claims that the Port continuously controls the actions of EAGLE and its employees and that they are subject at all times to the Port's pervasive and overriding supervision and control.

¶56 Viewing this evidence in the light most favorable to Afoa, a reasonable jury could conclude that the Port had sufficiently pervasive control over EAGLE and Afoa to create a duty to maintain a safe workplace. Therefore, summary judgment was inappropriate, and we affirm the Court of Appeals' reversal of summary judgment on this issue.

## CONCLUSION

¶57 Afoa has three potentially viable claims, each of which depends on disputed facts. The Port is wrong that the duty to keep the workplace safe depends on the formalities of contract language. To the contrary, both WISHA and our common law reject reliance on formalistic labels and place the responsibility of protecting our state's workers on the entity best able to ensure workplace safety. We affirm the Court of Appeals and remand for proceedings consistent with this opinion.

OWENS, FAIRHURST, STEPHENS, and GONZÁLEZ, JJ., and JOHANSON, J. PRO TEM., concur.

¶58 MADSEN, C.J. (concurring/dissenting) — I cannot agree with the majority's decision to affirm the Court of

Appeals on the issues of whether the Port of Seattle (Port) owed a common law duty based on retained control or a statutory duty under the Washington Industrial Safety and Health Act of 1973 (WISHA), chapter 49.17 RCW. Accordingly, I dissent on these two issues.

¶59 The common law retained control doctrine does not apply in the circumstances of this case as a matter of law. The majority erroneously concludes that this doctrine may apply, depending only on resolution of factual questions relating to the issue of the Port's retained control over the worksite. But the retained control doctrine is an exception to the general rule at common law that one who hires an independent contractor does not have a duty to protect an employee of the independent contractor from injury occurring while performing the contractor's work. Where there is no employment relationship between the defendant and an independent contractor, the general rule does not apply and neither does the retained-control exception.

¶60 The precedent relied on by the majority does not support its holding. The majority purports to follow *Kelley v. Howard S. Wright Construction Co.*, 90 Wn.2d 323, 329-34, 582 P.2d 500 (1978) and *Kamla v. Space Needle Corp.*, 147 Wn.2d 114, 121, 52 P.3d 472 (2002), claiming that under these cases no employment relationship is required and whether the retained control exception applies depends only on whether a principal has retained control over the workplace. Majority at 476-77. This is both an incorrect statement of the common law retained control doctrine and an incorrect representation of the analyses and holdings in *Kelley* and *Kamla*. The majority also incorrectly says that in *Kelley* this court decided that the duty to ensure a safe workplace "must be imposed on the entity best able to prevent harm to workers." Majority at 477. No such rule of liability is found in *Kelley*.

¶61 The underlying reason for the common law rule and its exception does not justify the majority's holding. The common law general rule is justified by the fact that the

employer of an independent contractor has no control over the work performance. The retained-control exception permits treating the employer of the independent contractor as if it is the direct employer of the worker because when the employer of the independent contractor retains control over work performance, it has effectively reserved to itself an employer's responsibility for safety of the worker. Just as a direct employer may be liable for workplace injuries to its employees, the employer of the independent contractor who retains control over the manner in which the work is done and the operative details, and thus acts as an employer acts, may be liable for workplace injuries. This policy underlying the no-liability rule and its exception does not apply when there is no employer-independent contractor-employment relationship.

¶62 If any liability exists here based on control over the worksite itself, where no employer-independent contractor relationship exists, it must be found under some other theory. The majority's approach does not accord with either the common law or our precedent.

¶63 I also disagree with the majority's analysis of the question whether liability may exist under WISHA. Again, a central premise is that the Port must have been the equivalent of a direct employer and therefore subject to the same legal obligations that an employer has under WISHA. None of our cases support the premise that WISHA liability exists otherwise.

## DISCUSSION

### Retained control exception

¶64 Under the common law an employer who hires an independent contractor has no liability for injuries to employees of the independent contractor where the injuries result from the work over which the independent contractor has control. *Kelley*, 90 Wn.2d at 330; *Tauscher v. Puget*

*Sound Power & Light Co.*, 96 Wn.2d 274, 277, 635 P.2d 426 (1981) ("one who engages an independent contractor is not liable for injuries to employees of the independent contractor resulting from the contractor's work"); *Fenimore v. Donald M. Drake Constr. Co.*, 87 Wn.2d 85, 94-95, 549 P.2d 483 (1976). This is the common law rule set out in the *Restatement (Second) of Torts* § 409 (1965), which states that "the *employer* of an *independent contractor* is not liable for physical harm caused to another by an act or omission of the contractor or his servants." (Emphasis added.)

¶65 This employment relationship is at the heart of the common law rule, and regardless of what the employer is called, whether an owner, general contractor, principal, or other term, it is the employment of an independent contractor, often a subcontractor, that invokes the rules applied in *Kelley*, *Kamla*, and relevant *Restatement* sections. The employer may be said to hire, employ, retain, engage, or contract with the independent contractor, but again the term used is not determinative. What is determinative as to whether the principles in *Kelley* and *Kamla* apply is whether an employer has hired an independent contractor and an employee of the independent contractor was injured during performance of the contractor's work.

¶66 The reason for the general rule of no-liability "is that, since the employer has no power of control over the manner in which the work is to be done by the contractor, it is to be regarded as the contractor's own enterprise, and he, rather than the employer, is the proper party to be charged with the responsibility of preventing the risk, and bearing and distributing it." RESTATEMENT (SECOND) OF TORTS § 409 cmt. b.

¶67 This common law rule has been the unvarying law in this state, and our decisional history shows that we have always applied the rule in the employer-independent contractor context, from *Ziebell v. Eclipse Lumber Co.*, 33 Wash. 591, 74 P. 680 (1903), and *Larson v. American Bridge Co. of New York*, 40 Wash. 224, 82 P. 294 (1905), to *Kelley*

and *Kamla*. *Larson* illustrates the general rule. There, a general contractor who had constructed tanks for the owner of a mill hired a subcontractor to erect the tanks. An iron worker who was employed by the subcontractor was injured during the work and he brought suit against the owner, who was dismissed, and the general contractor. The issue was whether the general contractor could be liable to the subcontractor's employee. The court explained that if the subcontractor was an independent contractor, the employer is not liable for the independent contractor's negligence: there is no privity between the employer and the independent contractor's injured employee, the relation of master and servant does not exist, and the doctrine of respondeat superior does not apply. The court explained the test for determining independent contractor status:

> The general test which determines the relation of independent contractor is that he shall exercise an independent employment, and represent *his employer* only as to the results of his work and not as to the means whereby it is to be accomplished. The chief consideration is that the *employer has no right of control* as to the mode of doing the work; but a reservation by the *employer* of the right to supervise the work, for the purpose of merely determining whether it is being done in accordance with the contract, does not affect the independence of the relation.

*Larson*, 40 Wash. at 227-28 (emphasis added). The court concluded that all of the evidence showed that the subcontractor was an independent contractor. *Id*. at 228. Therefore the general contractor that had hired the subcontractor was not liable. *Id*. No exception to this general rule of no-liability was at issue in the case.

¶68 In all of our cases, this no-liability general rule has been applied in the context of an employment relationship, which can be between a general contractor and an independent contractor (who is generally a subcontractor), as in *Larson*, or between an owner and an independent contractor, as in *Kamla*, where a contractor was hired to install

fireworks on the Space Needle. We recognized in *Kamla* that "[e]*mployers* are not liable for injuries incurred by independent contractors because *employers* cannot control the manner in which the independent contractor works." *Kamla*, 147 Wn.2d at 119 (emphasis added). The *Restatement* comment quoted above similarly states that the *employer* has no control over the manner in which the work is done by the independent contractor. But in all of the cases, the entity claimed to be liable had hired an independent contractor for whom the injured plaintiff performed the work.

¶69 Under the retained control exception to this common law rule, the employer of the independent contractor may be liable to an employee of the independent contractor. The common law exception exists where the employer hires an independent contractor but "retains the control of any part of the work." RESTATEMENT (SECOND) OF TORTS § 414; *Kamla*, 147 Wn.2d at 121 (the exception applies when an employer retains "the right to direct the manner in which the work is performed"); *Kelley*, 90 Wn.2d at 330. The employer then has a duty, within the scope of the retained control, to provide a safe place of work. *Kelley*, 90 Wn.2d at 331. The right to exercise this control is the test and actual exercise of control is not required. *Id.*

¶70 Notably, this retained control is not control over the worksite, but rather "control over the operative detail of doing any part of the work." RESTATEMENT (SECOND) OF TORTS § 414 cmt. a. "[T]he employer must have retained at least some degree of control over the manner in which the work is done." *Id.* cmt. c.

¶71 When the employer of the independent contractor retains control over part of the work, the employer "is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care." *Id.* § 414.

¶72 In the same way that the employer-independent contractor relationship must always exist for the general rule to apply, this relationship also exists when the exception applies. In *Kamla*, we explained that an independent contractor is not controlled by the employer or subject to the right to control physical conduct in performance of the undertaking, but an employee's physical conduct in performance of the service is controlled by or subject to the right to control of the employer. *Kamla*, 147 Wn.2d at 119 (citing RESTATEMENT (SECOND) OF AGENCY §§ 2(3), 2(2) (1958)). Because the employer cannot control the manner in which the independent contractor works, the employer is not liable, but an employer is liable for injuries to its own direct employees "precisely because the employer retains control over the manner in which the employee works." *Id.*[5]

¶73 When the employer does retain control over the manner in which a part of the independent contractor's work is performed, this retained control justifies placing potential liability on the employer of the independent contractor. The situation is analytically indistinguishable from the usual employer-employee relationship, to the extent that the employer's right of control over the manner and operative details of the work determines whether there is exposure to liability. Liability is possible under the retained control exception because the situation is comparable to the usual employer-employee relationship where the employer may be liable because of the right of control.

¶74 But merely controlling the worksite or workplace safety does not bring a case within the retained control exception. Rather, it is the equivalency of the retained control in the independent contractor setting to the control an employer exerts in the employer-employee relationship that justifies liability under the exception. A landlord,

---

[5] This responsibility for injury to one's employee is subject to statutory control. Under the state Industrial Insurance Act, Title 51 RCW, employers accepted limited liability in exchange for sure and certain relief for injured workers. *See Harry v. Buse Timber & Sales, Inc.*, 166 Wn.2d 1, 8, 201 P.3d 1011 (2009); *Cowlitz Stud Co. v. Clevenger*, 157 Wn.2d 569, 572, 141 P.3d 1 (2006).

owner, or licensor does not have employer-type duties resulting from the right to control unless the owner, landlord, or licensor engaged the worker who is injured or engaged an independent contractor and retained control over part of the work performance, i.e., the manner of performing the work and operative details of the work. A landlord, owner, or licensor should not be subject to what is at the core an *employer*'s liability under the retained control doctrine.

¶75 Accordingly, control or the lack of control of the performance of an independent contractor's work is the critical issue underpinning both the general rule and the retained control exception addressed in *Larson, Kelley,* and *Kamla,* as well as in other state cases. *See, e.g., Hennig v. Crosby Grp., Inc.,* 116 Wn.2d 131, 133-35, 802 P.2d 790 (1991); *Fardig v. Reynolds,* 55 Wn.2d 540, 544-45, 348 P.2d 661 (1960).[6]

¶76 Unfortunately, the majority creates liability without regard to the fact that the justification for the retained control exception does not exist in the absence of an employment relationship between the employer and an independent contractor in the first place.

¶77 Despite the majority's reliance on *Kelley* and *Kamla,* these cases do not support its new rule. In *Kelley,* we concluded that the exception applied because the general contractor had retained control. Multiple independent con-

---

[6] In *Fardig,* the court referred to "the ultimate test to be employed in determining whether a relationship is that of employer and employee or that of principal and independent contractor is to inquire whether or not the *employer* retained the right, or had the right under contract, to control the manner of doing the work and the means by which the result was to be accomplished." 55 Wn.2d at 544 (emphasis added). This statement could be somewhat confusing in that it uses the term "employer" in a context of the usual employer-employee relationship that does not involve an independent contractor situation and also in the broader context of employment of either an employee or an independent contractor. So long as it is understood that the common law rules discussed here (set out in *Restatement (Second) of Torts* §§ 409, 414) involve an owner, general contractor, or other principal *employing* an independent contractor, the confusion, if it exists, should be short-lived. The *Restatement,* as noted, uses the word "employer" rather than "principal."

tractors (subcontractors) had been hired by the general contractor to perform work on a common construction site where the general contractor had "general supervisory and coordinating authority under its contract with the owner, not only for the work itself, but also for compliance with safety standards." *Kelley*, 90 Wn.2d at 331. Because the general contractor had this authority over the working conditions on the construction site where the work of multiple subcontractors had to be supervised and coordinated, which the court saw as "clearly fall[ing] within the rubric of 'control' as an exception to the common-law rule of nonliability," the court concluded that the general contractor had a duty to see that proper safety precautions were taken in the common work areas. *Id.* at 331-32.[7]

¶78 Nothing in *Kelley*'s analysis suggests that one *who does not hire an independent contractor* is subject to its holding. The majority is not correct when it says that we disregarded "formalistic labels such as 'independent contractor'" in *Kelley*. Majority at 477. The court did not address the matter of "labels" and had no need to do so since the requisite employer-independent contractor(s) relationship existed in the case.

¶79 The majority is also wrong when it says that in *Kelley* we reasoned that the duty "must be imposed on the entity best able to prevent harm to workers" to ensure a safe workplace. Majority at 477. Liability was not found in *Kelley* just because the general contractor was best positioned to ensure workplace safety. Rather, in the context of the employer (general contractor)-independent contractors (subcontractors) relationships, liability could be found because of the employer-general contractor's retained supervisory and coordinating authority over the subcontractors' work in common work areas. *Kelley* did not set out a rule

---

[7] Two other exceptions to the no-duty rule applied in the circumstances and justified imposing a duty of care. First, the general contractor had reason to know of the peculiar risk of injury posed by the inherently dangerous nature of the work in which the employee was engaged, and second, a statutory duty arose under former RCW 49.16.030.

that *any entity* that is best placed to assure safety is under a duty to do so, regardless of whether it hired the independent contractor whose worker was injured or the degree and type of control the hiring entity retained. *Kelley* did not alter the fundamental general rule to which the retained control exception may apply.

¶80 The majority says, though, that in *Kelley* "[w]e held that the relevant inquiry is whether the principal retained control over the work site." Majority at 477. As explained above, though, *Kelley*'s holding is more restricted than this. First, the "principal" in the case had *hired* independent contractors. Second, the principal (the general contractor) had supervisory and coordinating authority under its contract for both the work and compliance with safety standards, and in particular had this authority in the area where several subcontractors all worked.

¶81 Control over the worksite, alone, is not the relevant question when determining whether one who hired an independent contractor has retained control and thus may be liable. It is control over the manner in which the work is performed that is critical. It is this type of control that makes the situation like that of the employer-employee relationship where the employer may be responsible for injury to the worker.

¶82 This understanding of *Kelley* was confirmed in *Kamla*. We expressly relied on *Kelley* for the "'retained control'" doctrine as correctly stating the principle that would justify imposing liability on the employer of an independent contractor. *Kamla*, 147 Wn.2d at 119-21. *Kamla* does not support the majority. In *Kamla*, the owner of the construction site, the Seattle Space Needle, was the entity that hired the independent contractor to install a fireworks display on the Space Needle. An employee of the contractor was injured during the installation and argued that the owner had retained control over the work and so owed a common law duty of care.

¶83 The primary issue in *Kamla* was whether we would modify the retained control exception described in *Kelley* in favor of a rule that actual control, rather than the right to control, must exist. We declined to do so, explaining that this state's law conforms to the common law rule and its exception:

> "The *employer* must have retained at least some degree of control over the manner in which the work is done. It is not enough that he has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations. Such a general right is usually reserved to *employers*, but it does not mean that the contractor is controlled as to his methods of work, or as to operative detail. There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way."

*Kamla*, 147 Wn.2d at 121 (emphasis added) (quoting RE-STATEMENT (SECOND) OF TORTS § 414 cmt. c). Again, the linchpin is the kind and degree of control of the employing entity.

¶84 We concluded in *Kamla* that because the Space Needle "did not retain control over the manner in which Pyro[-Spectaculars, the independent contractor,] installed the fireworks display or completed its work," and "[a]s an independent contractor" the company that was hired "was free to do the work in its own way," the Space Needle "did not owe a common law duty of care based on retained control" and was not liable for the injuries sustained by the independent contractor's employee. *Id.* at 122. *Kamla* thus expressly sets out the interrelationship of the general no-liability rule and the retained control exception when an independent contractor is hired. It shows that the retained control exception is impossible to separate from the general rule that applies only in this context. The degree of retained control directly involves whether and the extent to which one who hires an independent contractor reserves control

over work performance, and this in turn dictates whether there is exposure to liability.

¶85 *Kelley* and *Kamla* plainly involve only the context where an independent contractor is hired and the question is liability of the general contractor or owner to the employee of the independent contractor that was hired to perform the work. Neither *Kelley* nor *Kamla* suggest in any way that the common law retained control exception applies outside the employment relationship between an employer and an independent contractor. Neither case suggests any broad duty arising simply because an entity might be in a good position to ensure safety.

¶86 Neither case supports the majority's conclusion that the Port had a common law duty under the retained control exception to ensure that the air operations area at the airport was a safe workplace for the injured worker. Evergreen Aviation Ground Logistics Enterprise Inc. (EAGLE), for which Mr. Brandon Afoa worked, was an independent contractor *hired by the airlines* for support services. The Port did not hire EAGLE to perform any work and did not pay EAGLE for any work. Rather, EAGLE was required, according to the licensing contract, to pay the Port for the right to provide services to airlines. The airlines, not the Port, had contracts with and paid EAGLE for performance of services.

¶87 In short, the Port did not have an employer-independent contractor relationship with EAGLE. Accordingly, as a matter of law, the retained control exception set out in the *Restatement (Second) of Torts* and addressed in *Kelley* and *Kamla* does not apply here.

¶88 Finally, on this issue, the majority says that the fact that the Port entered a licensing agreement with EAGLE should not determine whether the retained control exception applies. I agree that what a contract is called does not control. However, while the way that an arrangement is characterized by the defendant should not control, there must be at the least facts from which it can be concluded

that the employer-independent contractor relationship exists.[8] Here, the contractual arrangement is without question not a contract to engage an independent contractor to perform work.

¶89 In summary, the majority professes to follow our precedent but instead reads *Kelley* to state principles that do not appear in the case. The majority certainly does not apply existing law when it holds that no employer-independent contractor relationship is required for the retained control exception to apply, and the policy justification for the common law retained control exception does not support its holding. If any theory of liability based on control of the workplace could be applicable, it is *not* the common law retained control exception set out in the *Restatement (Second) of Torts* § 409 and addressed in *Kelley* and *Kamla*.

## WISHA

¶90 The next issue is whether the Port of Seattle may be liable based on WISHA. I believe the majority's analysis is incomplete and to a substantial extent unconvincing. Moreover, it greatly expands the bases for liability under WISHA but without sufficient justification in WISHA law or its purposes.

¶91 The relevant principles are set out in *Stute v. P.B.M.C., Inc.*, 114 Wn.2d 454, 788 P.2d 545 (1990), and confirmed in *Kamla*. Because the general rule that an employer must provide a safe workplace under RCW 49.17.060(1) applies only to the employer's own employees, only the obligation in RCW 49.17.060(2) is at issue. It

[8] In this regard, I cannot agree with the majority's insinuation that the Port has written its licensing contracts to avoid being treated as EAGLE's and Afoa's employer. The majority says that "[t]he Port has structured its contracts with workers like EAGLE and Afoa such that those workers are not technically Port employees." Majority at 478. EAGLE was hired by the *airlines* to do work for the *airlines*. It is difficult to see how the Port manipulated its licensing agreement to avoid being treated as the employer, and there is nothing to support the implication that but for "technicalities" the Port would have been EAGLE's or Afoa's employer.

provides that "[e]ach employer . . . [s]hall comply with the rules, regulations, and orders promulgated under this chapter." RCW 49.17.060(2). Subsection (2)'s specific duty to comply with WISHA regulations is not "confined to just the employer's own employees but applies to all employees who may be harmed by an employer's violation of the WISHA regulations." *Stute*, 114 Wn.2d at 458 (citing *Goucher v. J.R. Simplot Co.*, 104 Wn.2d 662, 672, 709 P.2d 774 (1985)). This duty applies only when a party asserts that the employer did not follow particular WISHA rules. *Id.* at 457 (citing *Adkins v. Aluminum Co. of Am.*, 110 Wn.2d 128, 153, 750 P.2d 1257, 756 P.2d 142 (1988)).

¶92 In *Stute*, we explained that the specific duty clause applies to employees of subcontractors, *id.* at 458, and that "[e]mployers must comply with the WISHA regulations to protect not only their direct employees but all employees on the jobsite," *id.* at 460. The court held that a general contractor has a nondelegable specific duty to ensure compliance with workplace regulations, reasoning that a "general contractor should bear the primary responsibility for compliance with safety regulations because the general contractor's innate supervisory authority constitutes sufficient control over the workplace." *Id.* at 464. Manifestly, the rule in *Goucher* and *Stute* applied to the general contractor who employed independent contractor-subcontractors and had supervisory authority over the common workplace and concerned duties owed by a general contractor to the direct employees of an independent contractor-subcontractor. This type of liability is a per se liability where work in the common work area is concerned, the court reasoned.

¶93 Then in *Kamla*, we addressed application of RCW 49.17.060(2) to a jobsite owner. The court concluded that jobsite owners are not per se liable because nothing in WISHA imposes this duty and they are not sufficiently analogous to general contractors. As the court said:

> Although jobsite owners may have a similar degree of authority to control jobsite work conditions, they do not neces-

sarily have a similar degree of knowledge or expertise about WISHA compliant work conditions. Jobsite owners can run the gamut from an owner/developer with the same degree of knowledge about WISHA compliant work conditions as that of a general contractor to a public corporation without any knowledge about WISHA regulations governing a specific trade. Because jobsite owners may not have knowledge about the manner in which a job should be performed or about WISHA compliant work conditions, it is unrealistic to conclude all jobsite owners necessarily control work conditions. Instead, some jobsite owners may reasonably rely on the contractors they hire to ensure WISHA compliance because those jobsite owners cannot practically instruct contractors on how to complete the work safely and properly.

*Kamla*, 147 Wn.2d at 124-25.

¶94 Accordingly, the court concluded, "If a jobsite owner does not retain control over the manner in which an independent contractor completes its work, the jobsite owner does not have a duty under WISHA to 'comply with the rules, regulations, and orders promulgated under [chapter 49.17 RCW].' RCW 49.17.060(2)." *Id.* at 125 (alteration in original).

¶95 While the majority acknowledges these general principles, it then makes two substantial departures from them. First, in addressing whether the Port had sufficient control, it emphasizes the Port's control over the work area where EAGLE operated and Mr. Afoa was injured. But outside the general contractor situation, *Kamla* at the very least suggests that it is control over the *manner of performing the work* that is of paramount importance. Thus, what the majority should focus on is the extent to which the Port had any control over the manner in which Mr. Afoa performed his work, not the worksite itself. *Id.* If this kind of control existed, it would then tend to support the responsibility to make the workplace safe for EAGLE's workers.

¶96 Importantly, because the Port has no employer-independent contractor relationship with EAGLE, and instead has a licensing agreement, this case is not like *Kamla*.

¶97 However, in rejecting the Port's claim that it had only a licensing agreement and so does not have the duty to comply with WISHA in connection with Mr. Afoa's work, the majority broadly states that the specific duty does not run just to the "principal's employees, but to all workers on the worksite who may be harmed by WISHA violations." Majority at 473 (citing *Goucher*, 104 Wn.2d at 671; *Stute*, 114 Wn.2d at 460).

¶98 This is an expansion of prior law. The court preceded its statement in *Stute* that the specific duty applies to "all employees on the jobsite" with an extremely important qualifying sentence that refers to the "holdings that the WISHA regulations apply to employees of independent contractors as well as direct employees of an employer." *Stute*, 114 Wn.2d at 460. The court did not purport to set forth the broad rule the majority reads into the case. Nor, factually, did *Stute* involve anything other than an employer-independent contractor setting, specifically, the general contractor-subcontractor relationship. As in *Stute*, *Kamla* also involved the issue whether the jobsite owner owed WISHA duties to an independent contractor, in this case in the form of the owner employing an independent contractor.

¶99 Prior to the majority's unjustified expansion of WISHA liability, there was no broad rule applying to all situations where a landowner with employees on the property must comply with specific duties to another employer's employees.

¶100 We should decline to expand WISHA liability in this way and, instead, follow *Stute* and *Kamla* and limit liability to the employment situation—either direct employment or retained control of work performance in an employer-independent contractor situation. If the legislature concludes that jobsite owners should have greater duties under WISHA, then it can amend the statutes to make this clear.

¶101 One obvious problem that otherwise arises is that a landlord could find itself faced with colorable claims that it has violated WISHA through control of the *workplace* where this control results because of a *landlord*'s legal obligations to tenants to maintain safe common areas. WISHA is, however, a statute pertaining to workplace safety requirements, not a landlord's obligations, and the duty at issue here involves obligations of an *employer* or one so like an employer that the same duties must be imposed.

¶102 The majority unfortunately does not satisfactorily explain why an entity that has no direct or employer-independent contractor employment relationship with EAGLE or Mr. Afoa has any specific duty under WISHA. If the fact that the Port has its own employees who work at the same area is the only basis for holding the Port to the specific duty under RCW 49.17.060(2), then an onerous obligation is imposed indeed. I do not believe that merely because a property owner has employees working on the same grounds as workers for other employers may work, a duty arose under WISHA, especially where the work proceeded under a licensing agreement that regulates the parties' responsibilities.

¶103 In addition, as we suggested in *Kamla*, jobsite owners may have little knowledge or expertise about a particular job; the dangers that might be entailed in or associated with carrying out a particular job; the necessary training and education required to safely carry out particular job duties; and the use and maintenance of necessary tools, equipment, clothing and other gear, and so on.

¶104 Accordingly, even if an employer-independent contractor relationship exists and therefore WISHA duties may exist, great care must be taken to ensure than any control retained over the work actually pertains to the work performance. If a jobsite owner requires, for example, that employees of the independent contractor who work on the site enter and leave at certain hours, refrain from using noisy equipment prior to 8:00 a.m., leave a picnic area on

the grounds free from clutter, return all equipment and tools to the proper storage area, and engage in safe working practices while present, there is no basis to conclude that the owner controls the worker or work in any way sufficient to impose the specific duty under RCW 49.17.060(2). These are not the work-related duties that put the jobsite owner in the position of the employer. And the control must be over the *work*, not simply the jobsite. An owner who bars workers from entry prior to 7:00 a.m. is certainly controlling the work site, but this is no reason to permit a claim based on WISHA.

¶105 The second major concern I have with the majority is that it does not address the specific regulations claimed to have been violated. That is, assuming that WISHA does apply, the majority fails to address any of the specific claims. Under RCW 49.17.060(2), the duty is to comply with "the rules, regulations, and orders promulgated under" WISHA. Mr. Afoa cites a number of specific WISHA violations based on alleged failures: a failure to inspect the pushback accordingly to manufacturer standards, a failure to maintain this vehicle in a safe condition, the failure of the pushback to meet design and construction requirements, the failure to remove it from service because it was not in a safe working condition, a failure to protect him from falling objects, and the failure to properly train him to operate the vehicle and to ensure he operated it at a safe speed. However, none of the Port's regulations in its licensing agreement govern vehicle maintenance except to impose a rule about where the vehicle could be maintained.

¶106 As *Kamla* teaches, the Port should not be held responsible for training Afoa when he was not the Port's employee, the Port was not engaged in providing operational services of the type provided by EAGLE, and the Port would not itself be knowledgeable in all the operational aspects of EAGLE's contracts with the airlines. There also seems to be no basis for making an owner-licensor like the Port responsible for maintenance of its licensee's vehicles.

¶107 It seems the only WISHA regulation that the Port might have had a duty to comply with, assuming such duties exist, is a vehicle speed restriction. This is the kind of regulation that the Port was in a position to implement because it would and should apply as to all employers who might use the area. But in fact the Port did impose a 20 m.p.h. limit or slower if conditions required in areas of airplane movement, and this limit was included in the license agreement. The record shows that the Port acted to enforce this limit. I question whether the Port should be liable in this regard. Moreover, I question why the Port should be exposed to liability when it imposed this speed limit as a condition of the license granted to EAGLE because EAGLE and Afoa violated the contractual agreement if they failed to abide by it.

¶108 Finally, I am quite concerned about the extensive federal regulatory scheme that assuredly applies to international airport operation. The Port's state obligations under WISHA, if any are owed to EAGLE and Mr. Afoa under the circumstances here, may have to be assessed in light of federal law if any conflicts arise. It is possible that determinations may have to be made about possible preemption issues. Accordingly, I believe the court should expressly acknowledge that any decisions it provides under WISHA are subject to any prevailing federal law regarding airport operations.[9]

## CONCLUSION

¶109 The majority makes it seem that all it is doing is applying existing legal principles to this case. I strongly disagree because both with respect to the common law

---

[9] Although I agree that a duty might be owed to EAGLE and Afoa as business invitees, I am dismayed by the majority's unfortunate attribution to the Port of ignorance about the type of invitation at issue. Contrary to the majority, the Port is well aware that a social invitation is not the relevant kind of invitation at issue. *See* majority at 468-69 (erroneously saying that the Port has confused the meaning of "invitee" as a term of art with "social convention").

retained control and WISHA issues the majority extends liability far beyond its existing state. We have never imposed duties under these laws when the defendant did not have either a direct employer-employee relationship to the injured worker or an employer-independent contractor relationship where the injured worker was directly employed by the independent contractor.

¶110 Among many mistakes, one of the most serious made by the majority is to blur the line between control over a worksite, which an owner or possessor of land may have, with control over the performance of the work itself. There is an important and meaningful difference, and because of the majority's lack of care in keeping the two distinct, landowners are apt to find themselves faced with liability for workers with whom they have little connection except the jobsite itself.

¶111 I would reverse the Court of Appeals determinations that a duty was owed under the common law retained control doctrine and WISHA and hold that as a matter of law no duty was owed under these theories. I agree that factual issues remain regarding potential liability under the common law duty a land possessor owes to invitees.

C. JOHNSON and J.M. JOHNSON, JJ., concur with MADSEN, C.J.