[No. 53388-6-I. Division One. January 10, 2005.]

MARTINEZ MELGOZA & ASSOCIATES, INC., *Appellant*, v. THE DEPARTMENT OF LABOR AND INDUSTRIES, *Respondent*.

*Douglas W. Hales*, for appellant.

*Robert M. McKenna, Attorney General*, and *Bourtai B. Hargrove, Assistant*, for respondent.

¶1 AGID, J. — Martinez Melgoza and Associates, Inc. (MMA), worked as an asbestos consultant on a Port of Seattle asbestos abatement project. The Department of Labor and Industries (L&I) cited MMA for unsafe asbestos work practices and conditions in violation of the Washington Industrial Safety and Health Act of 1973 (WISHA), chapter 49.17 RCW, and the Board of Industrial Insurance Appeals (BIIA) affirmed. MMA now appeals the superior court's order affirming the BIIA's decision, arguing that as a consultant, it is not subject to penalties for WISHA viola-

tions. But a business entity that controls a jobsite may be liable for safety violations, and substantial evidence shows that, in practice, MMA controlled the jobsite. We affirm.

## FACTS

¶2 In 1999, Host Marriott, an airport concessions company, began remodeling concession areas in the north and south satellites of the SeaTac International Airport. The project required interior demolition and asbestos abatement, so the Port of Seattle contracted with several companies to coordinate the asbestos removal. It contracted with Argus Pacific, an asbestos consultant, to design the project, with asbestos abatement contractor Long Services Corporation to remove the asbestos from the north satellite, and with FS&GS Services to remove the asbestos from the south satellite.

¶3 After the project began, Host Marriott significantly increased the scope of work and shortened the completion schedule, requiring the Port to contract with five more asbestos abatement contractors. The Port also contracted with project designer Argus Pacific to provide asbestos support services.

¶4 MMA provided asbestos consulting services to the Port under three separate contracts. The first contract was between the Port and MMA. The second was between the Port and LinWorks Environmental Services, under which MMA acted as a subconsultant. The third contract was between the Port and Argus Pacific, with MMA again acting as a subconsultant. According to these contracts, MMA was to provide professional and technical assistance and "work through the Asbestos Program Manager to ensure a quality project within regulatory compliance, time and cost guidelines." MMA's duties included facility surveys, bulk sampling, air sampling, project inspection and coordination, project monitoring, cost estimates, emergency response, compliance guidance, and analysis services. MMA was also to maintain a monitoring, analysis, and inspection log. The

contracts granted ultimate responsibility for all decision making to the Port's Asbestos Program Manager and Project Engineer.

¶5 Because Host Marriott drastically reduced the time to complete the project,[1] the asbestos abatement employees had to work double and triple shifts. MMA monitored the work on all shifts, and MMA employees were present at all hours. Because the project was so rushed, MMA allegedly reduced the frequency and thoroughness of its inspections, authorized the contractors to stop working before all asbestos-containing material was removed, and instructed the contractors to work without proper safeguards. After the abatement project was completed, the general construction contractor began its work and found asbestos debris in various places. Asbestos abatement contractors returned to the site to clean up the remaining asbestos, but because they were behind schedule, MMA again allegedly instructed them to perform their work without the required safeguards.

¶6 In April 1999, a project employee filed a complaint with L&I alleging unsafe asbestos work practices and conditions at the airport. In October 1999, after inspecting the project sites, L&I cited MMA for seven violations of WISHA regulations. These violations involved: (1) allowing, and even directing, the employees to perform asbestos-related work without required safeguards; (2) directing abatement workers to leave asbestos materials in wall cavities; (3) failing to fully inspect all areas; (4) failing to ensure that all areas were adequately encapsulated; (5) failing to demonstrate that clearance samples were taken as required; and (6) failing to institute the necessary quality assurance programs. L&I categorized these violations as willful and imposed a $63,000 fine against MMA. L&I cited MMA, rather than other contractors on the site, because MMA was the on-site asbestos abatement consultant and project agent for the Port and thus had the

---

[1] According to an FS&GS employee, the project was originally scheduled to last 180 days but was eventually reduced to 45 days.

authority to and responsibility for ensuring that appropriate asbestos abatement procedures were followed.

¶7 MMA appealed the citation to the BIIA. In August 2002, the BIIA affirmed the citation but reduced three of the violations from willful to serious and imposed a total penalty assessment of $38,700. In October 2003, the King County Superior Court affirmed the BIIA's decision. MMA appeals, arguing that it cannot be held liable for WISHA violations.

## DISCUSSION

■ ¶8 In its Decision and Order, the BIIA stated that despite the contractual language assigning the ultimate responsibility for the project to the Port's Asbestos Program Manager, the realities of the workplace indicated that MMA

> had the authority to exercise control and did, in fact, exercise sufficient control over the work processes **in fact** to be held liable for safety violations. [MMA] exercised considerable control over the subcontractors and in the exercise of this authority, directed and/or encouraged the violation of safety and health rules. . . .

This statement is a finding of fact, although the BIIA did not label it as such. And while MMA does not specifically challenge any of the BIIA's findings of fact, it does challenge the BIIA's conclusion that MMA may be held liable for safety violations. Thus we assume that MMA is challenging a factual finding made by the BIIA. We review the BIIA's findings of fact for substantial evidence and must determine whether its conclusions of law are appropriate based on its factual findings.[2] Substantial evidence is " 'evidence

---

[2] *Danzer v. Dep't of Labor & Indus.*, 104 Wn. App. 307, 319, 16 P.3d 35 (2000) (citing RCW 49.17.150(1); *Young v. Dep't of Labor & Indus.*, 81 Wn. App. 123, 128, 913 P.2d 402, *review denied*, 130 Wn.2d 1009 (1996)), *review denied*, 143 Wn.2d 1020 (2001).

in sufficient quantum to persuade a fair-minded, rational person of the truth of a declared premise.' "[3]

■ ¶9 WISHA requires that all employers furnish a workplace free of recognized hazards[4] and authorizes L&I to cite any employer that fails to do so.[5] Any entity that engages in any business and employs one or more employees is an employer for WISHA purposes.[6] MMA argues that it is not an employer under WISHA because it was merely a consultant with limited duties. But the evidence shows that MMA exercised a great deal of control over the worksite and may therefore be liable under the multiemployer worksite doctrine.

¶10 The multiemployer worksite doctrine arose in the context of the federal Occupational Safety and Health Act (OSHA), 29 U.S.C. §§ 651-78 and has been adopted by most of the federal courts that have considered it, including the Ninth Circuit Court of Appeals.[7] Under the doctrine, "an employer who controls or creates a worksite safety hazard may be liable under [OSHA] even if the employees threatened by the hazard are solely employees of another employer."[8] OSHA delineates employers' duties, stating that each employer

---

[3] *In re Welfare of Snyder*, 85 Wn.2d 182, 185-86, 532 P.2d 278 (1975) (quoting *Helman v. Sacred Heart Hosp.*, 62 Wn.2d 136, 147, 381 P.2d 605 (1963)).

[4] RCW 49.17.060.

[5] RCW 49.17.120(1).

[6] RCW 49.17.020(4).

[7] *See Universal Constr. Co. v. Occupational Safety & Health Review Comm'n*, 182 F.3d 726 (10th Cir. 1999); *United States v. Pitt-Des Moines, Inc.*, 168 F.3d 976 (7th Cir. 1999); *Teal v. E.I. DuPont de Nemours & Co.*, 728 F.2d 799 (6th Cir. 1984); *Beatty Equip. Leasing, Inc. v. Secretary of Labor*, 577 F.2d 534 (9th Cir. 1978); *Marshall v. Knutson Constr. Co.*, 566 F.2d 596 (8th Cir. 1977); *Brennan v. Occupational Safety & Health Review Comm'n*, 513 F.2d 1032 (2d Cir. 1975). *But see Melerine v. Avondale Shipyards, Inc.*, 659 F.2d 706 (5th Cir. 1981).

In interpreting WISHA, we may consider OSHA and federal cases interpreting OSHA for guidance. *Inland Foundry Co. v. Dep't of Labor & Indus.*, 106 Wn. App. 333, 336, 24 P.3d 424 (2001) (citing *Adkins v. Aluminum Co. of Am.*, 110 Wn.2d 128, 146, 750 P.2d 1257, 756 P.2d 142 (1988)).

[8] *Universal Constr.*, 182 F.3d at 728. The multiemployer worksite doctrine appears to apply only to construction worksites. *Id.* at 730 (citing *Am. Petroleum*

"(1) shall furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees;

"(2) shall comply with occupational safety and health standards promulgated under this chapter."[9]

Because subsection two omits any language expressly limiting an employer's liability to its own employees and because OSHA exists " 'to assure so far as possible every working man and woman in the Nation safe and healthful working conditions[,]' "[10] courts concluded that the multi-employer doctrine is consistent with OSHA.[11]

¶11 Washington courts have adopted a similar rule. Like OSHA, WISHA creates a two-fold duty: first, it requires employers to protect their own employees, and second it requires employers to comply with WISHA regulations.[12] And, like OSHA, WISHA aims to "assure, insofar as may reasonably be possible, safe and healthful working conditions for every man and woman working in the state . . . ."[13] In *Goucher v. J.R. Simplot Co.*, the Washington Supreme Court noted the similarities between the two statutes and, drawing upon federal case law, held that "WISHA regulations should be construed to protect not only an employer's own employees, but *all* employees who may be harmed by the employer's violation of the regulations."[14] And in *Stute v. P.B.M.C., Inc.*, the Supreme Court affirmed *Goucher* and specifically held that general contractors have a duty to all employees to ensure WISHA compliance because their

---

*Inst. v. Occupational Safety & Health Admin.*, 581 F.2d 493, 508 (5th Cir. 1978), *aff'd*, 448 U.S. 607, 100 S. Ct. 2844, 65 L. Ed. 2d 1010 (1980)).

[9] *Id.* at 728 (quoting 29 U.S.C. § 654(a)).

[10] *Id.* at 730 (quoting 29 U.S.C. § 651).

[11] *Id.* (citing *Pitt-Des Moines*, 168 F.3d at 983; *Brennan*, 513 F.2d at 1038).

[12] RCW 49.17.060.

[13] RCW 49.17.010.

[14] 104 Wn.2d 662, 672, 709 P.2d 774 (1985).

supervisory authority gives them sufficient control over the workplace.[15]

¶12 Relying primarily on *Stute*, Washington courts have assessed an employer's liability for WISHA violations by considering the employer's supervisory authority and control over the worksite[16] and whether the employer controlled or created the worksite's dangerous condition.[17] This is consistent with federal case law.[18] It is also consistent with decisions made by the Occupational Safety and Health Review Commission (OSHRC), the federal agency charged with reviewing OSHA citations. The OSHRC imposes liability under the multiemployer worksite doctrine if the violating employer was a creating, exposing, correcting, or controlling employer.[19]

¶13 In this case, substantial evidence demonstrates that MMA exercised sufficient control over the worksite to qualify under the doctrine. According to the OSHRC, an employer may be categorized as controlling if a contract

[15] 114 Wn.2d 454, 463-64, 788 P.2d 545 (1990).

[16] *Kamla v. Space Needle Corp.*, 147 Wn.2d 114, 125, 52 P.3d 472 (2002) (a jobsite owner does not have a duty to comply with WISHA unless it retained control over the manner in which the work was completed); *Jones v. Halvorson-Berg*, 69 Wn. App. 117, 124, 847 P.2d 945 ("A subcontractor is liable for injuries arising from work areas under its control.") (citing *Stute*, 114 Wn.2d at 461-64), *review denied*, 122 Wn.2d 1019 (1993); *Doss v. ITT Rayonier, Inc.*, 60 Wn. App. 125, 128, 803 P.2d 4 (a property owner could be liable to all employees because it had innate supervisory authority that gave it control over the workplace), *review denied*, 116 Wn.2d 1034 (1991); *Weinert v. Bronco Nat'l Co.*, 58 Wn. App. 692, 696, 795 P.2d 1167 (1990) (an owner/developer could be liable to all employees because it, like a general contractor, had supervisory authority that gave it sufficient control over the workplace).

[17] *Halvorson-Berg*, 69 Wn. App. at 124 ("a subcontractor is liable to the extent it controls or creates a dangerous condition") (citing *Stute*, 114 Wn.2d at 461; *Husfloen v. MTA Constr., Inc.*, 58 Wn. App. 686, 688-90, 794 P.2d 859, *review denied*, 115 Wn.2d 1031 (1990)).

[18] For example, the Ninth Circuit held that OSHA's purpose "can best be effectuated by placing the responsibility for hazards on those who *create* them[,]" *Beatty Equip.*, 577 F.2d at 537 (emphasis added); and the Tenth Circuit held that employers are liable for hazards they either created *or* controlled. *Universal Constr.*, 182 F.3d at 730.

[19] *Davis Bros. Constr. Co.*, 20 O.S.H. Cas. (BNA) 1315, 2003 WL 21788885, at *5, 2003 OSAHRC LEXIS 76 (citing OSHA Directive, CPL 2-0.124, ¶ X.A. 1 and 2 (1999)).

establishes control over the worksite or if the employer actually has control without explicit contractual authority.[20] Similarly, in Washington, "[l]iability may arise if the subcontractor contractually assumed responsibility for safety precautions at the worksite or is shown to have been in control of the method of performing the work."[21]

¶14 In this case, L&I argues that explicit contractual provisions made MMA a controlling employer. Specifically, the contracts required MMA to have personnel immediately available on a 24-hour basis, inspect the safety precautions taken by the contractors, inspect the abatement process, and notify the Asbestos Program Manager when the project passed inspection. Although the contracts did not grant MMA the authority to stop work, they did allow it to request a stop work order if it concluded the abatement activities did not meet the regulatory requirements. And the contracts required MMA to keep a monitoring, analysis, and inspection log which was "to be the eyes and ears of the Port . . . ." But while these contractual provisions grant authority to MMA, others do the opposite. For example, the contracts reserve the ultimate responsibility for decision-making to the Port's Asbestos Program Manager.

¶15 But we need not decide whether the contracts were sufficient to grant MMA the right to control the worksite because, as the BIIA found, MMA exercised a great deal of control over the worksite in *actual practice*. The testimony of several of the project's employees supports this finding.

¶16 Thomas Erwin, the Port's Asbestos Program manager, testified that he believed MMA had the authority to stop work if the asbestos abatement contractors failed to comply with WISHA. Hector Rodriguez, an abatement contractor employee, testified that MMA's owner, Carmen Martinez, was a "major player" at the south satellite worksite because "she had total control of it." FS&GS

---

[20] *Id.* (citing CPL 2-0.123, ¶ X.E.5.a-d).

[21] *Halvorson-Berg*, 69 Wn. App. at 124-25 (citing *Bozung v. Condo. Builders, Inc.*, 42 Wn. App. 442, 711 P.2d 1090 (1985); *Ward v. Ceco Corp.*, 40 Wn. App. 619, 626, 699 P.2d 814, *review denied*, 104 Wn.2d 1004 (1985)).

president and owner Gordon Williams testified that MMA "had all authority. [Martinez] could run us off the Port if she chose to do so." He also testified that MMA had total responsibility over Alpha Insulation and Crown Delta Environmental, two asbestos abatement contractors hired after the project began. He understood MMA to have stop work authority and said that his company would do anything that MMA instructed it to do because MMA was the Port's representative. And, according to Williams, MMA ensured that the contractors did everything in accordance with WISHA and OSHA standards.

¶17 Michael Miller, an FS&GS project coordinator, testified that in March of 1999,

[Martinez] informed me that she was now in control of this project. The actual control had been taken away from F.S. & G.S. and turned over to [MMA] regarding these two areas where we had no say over what the contractors were doing at all.

. . . .

Gordon [Williams] told me directly that control of the containment is now turned over to [MMA]. . . .

In other words, one of the biggest things this meant to us, F.S. & G.S., was that with two other contractors on site, if they only had one guy show up, we had nothing to do with it. It wasn't our problem. It wasn't our issue. It was [MMA]'s issue. We had no say over who was doing what and where at that point.

Similarly, FS&GS supervisor Michael Jackson testified that he originally thought MMA was simply going to monitor the job. "But as the job went on, it was basically, I would say more like an on site project manager that explains to us what needed to be [done], how we needed to do it, and what we was going about to do the job [sic]." Jackson also testified that because the job was so rushed, MMA sometimes instructed employees to leave asbestos-contaminated material inside an abatement area or to refrain from setting up the safety precautions. He said he felt obligated to take

direction from MMA because "[Martinez] was the one running the project . . . ."

¶18 Asbestos abatement supervisor Leno Figueroa testified that he was "instructed that [Martinez] was going to be directing our crew on what to do and how to do it. She provided all the details and also went inside the containment with my crew to direct them on what she wanted done." James Albro, a certified asbestos supervisor, described Martinez as performing the role of a general foreman and stated that MMA was in charge of the work at the Port. Adrian Cantu, another certified asbestos supervisor, testified that he always felt obligated to take direction from MMA because Martinez conveyed that she was the Port's representative by frequently stating, "I am the [P]ort."

¶19 Despite this evidence, MMA argues that it did not have control over the worksite because it did not design the project, hire or fire contractors, or negotiate change orders. But the relevant inquiry is whether MMA had actual control over the method of doing the work and enforcing safety standards. The record establishes that it did. We conclude that substantial evidence demonstrates that MMA, in actual practice, exercised sufficient control over the worksite so as to be liable for the WISHA citations under the multiemployer worksite doctrine. And contrary to MMA's assertion at oral argument, this conclusion is consistent with OSHA cases, as the deciding factor in those cases was not how much the employer participated in the planning or the execution of that plan, but how much supervisory control it had.[22]

---

[22] *See Fleming Constr., Inc.*, 18 O.S.H. Cas. (BNA) 1708, 1999 WL 236048, 1999 OSAHRC LEXIS 36 (company hired to oversee construction was not liable for OSHA violation because it did not control or direct construction activities or implement safety measures); *CH2M Hill Cent., Inc.*, 17 O.S.H. Cas. (BNA) 1961, 1997 WL 197011, 1997 OSAHRC LEXIS 34 (consulting engineer was liable for OSHA violations because, in actual practice, it had broad and extensive authority over a wide range of construction activities), *petition for review dismissed*, 131 F.3d 1244 (7th Cir. 1997); *Foit-Albert Assocs., Architects & Eng'rs, P.C.*, 17 O.S.H. Cas. (BNA) 1975, 1997 WL 197016, 1997 OSAHRC LEXIS 35 (an engineering company was not liable for OSHA violations because it had no contractual or actual authority to direct the trade contractors' activities); *Secretary of Labor v.*

¶20 We affirm.[23]

COLEMAN and GROSSE, JJ., concur.

Review denied at 155 Wn.2d 1015 (2005).

*Simpson, Gumpertz & Heger, Inc.*, 15 O.S.H. Cas. (BNA) 1851, 1992 WL 224829, 1992 OSAHRC LEXIS 105 (engineering company was not liable for OSHA violations because it contracted to provide design and consulting services for the architect but had no actual or direct responsibility for the jobsite's working conditions), *aff'd*, 3 F.3d 1 (1st Cir. 1993); *Skidmore, Owings & Merrill*, 5 O.S.H. Cas. (BNA) 1762, 1977 WL 8018, 1977 OSAHRC LEXIS 286 (an architectural and engineering firm was not liable for OSHA violations because by contract, and in actual practice, the firm had no responsibility for or authority to direct or supervise construction methods).

[23] L&I requests attorney fees and costs on appeal. But because L&I cites no authority to support an attorney fee award, we deny the request. *See* RAP 18.1.