# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| HAMILTON CONSTRUCTION CO., | No. 54578-1-II |
| Appellant, | |
| v. | UNPUBLISHED OPINION |
| DEPARTMENT OF LABOR & INDUSTRIES OF THE STATE OF WASHINGTON, | |
| Respondent. | |

MAXA, J. – The Department of Labor and Industries (DLI) issued a citation against Hamilton Construction Company for violations of regulations under the Washington Industrial Safety and Health Act of 1973 (WISHA), chapter 49.17 RCW, related to demolition work on a highway overpass in Bonney Lake. The citations arose from an incident in which two Hamilton workers for Hamilton's subsidiary were using a curb saw to cut a concrete rail barrier on the overpass when the barrier fell onto the roadway below and killed three people in a passing vehicle.

DLI cited Hamilton for failing to have a written engineering survey, failing to ensure that nobody was working below the bridge during the cutting operation, and failing to ensure that the barrier was secured or braced during demolition. The Board of Industrial Insurance Appeals (Board) issued a decision and order that affirmed three violations. On appeal, the superior court affirmed the Board's decision and order.

We conclude that (1) substantial evidence supports the Board's findings that Hamilton was a subcontractor and an "employer" subject to liability under WISHA, (2) substantial evidence supports the Board's findings of fact and conclusions of law affirming the three WISHA violations, and (3) substantial evidence supports the Board's implied findings of fact that Hamilton had actual or constructive knowledge of the WISHA violations. Accordingly, we affirm the superior court's order affirming the Board's decision and order.

FACTS

*Background*

Hamilton operates as a prime contractor on construction projects and primarily builds bridges. Hamilton is the parent company of American Concrete Company, which specializes in concrete cutting, including saw cutting, grinding, and surface preparation. American Concrete operates as a subcontractor on most projects. American Concrete had approximately 20 employees at the time of the DLI inspection.

When a third party wants American Concrete to perform concrete cutting on a project, the procedure is to contact American Concrete's dispatcher with the details of the project. Based on the information given from the third party, American Concrete determines the type of equipment necessary to complete the requested cut and which operators should be sent for the job. American Concrete typically provides its own equipment for a job.

If the third party request involves a large project or requires American Concrete to be involved in the planning process, then American Concrete will enter into a written contract with the requesting party. If the third party request is on short notice or for a project lasting a day or less, no contract typically is created because usually there is not enough time to complete the paperwork and execute a contract before the work takes place.

*Bonney Lake Project*

The City of Bonney Lake contracted with a general contractor to modify and/or repair a bridge on State Route 410, which was an overpass over another road. The general contractor hired a number of subcontractors, including Staton Companies, to work on the Bonney Lake project. Staton was a demolition subcontractor.

On April 12, 2015, a Staton employee contacted Rick Garrick, an American Concrete dispatcher, about the Bonney Lake project. Staton wanted to hire American Concrete to remove a concrete rail barrier on a bridge deck.

Because of the small size of the job, no written contract was created. Based on the information given from Staton, Garrick dispatched two American Concrete employees, Richard Dugan and Donald Corkhill, with a large curb saw on a trailer, a vacuum truck, a water tank, and other equipment. A curb saw is a large machine, eight feet long and five feet wide, that is used to cut concrete.

Dugan was a trained curb saw operator while Corkhill was a vacuum operator. Dugan operated the curb saw, which involved spraying water from the water tank to cut concrete. This produced a liquid substance called slurry, a mixture of concrete and water. Corkhill vacuumed the slurry behind the curb saw.

On April 13, Dugan and Corkhill met the Staton foreman, Morgan Marney, at a freeway exit away from the jobsite. Dugan and Corkhill did not know where the job was located until they were taken there. When they arrived at the job site, Marney showed schematic as-built diagrams to Dugan. The as-built diagrams showed how the bridge originally was built but did not provide information as to how Dugan should cut the barrier. Dugan explained that the as-built diagrams showed where the steel was located to give him an idea as to how deep he needed

to cut. The as-built diagrams did not accurately depict the bridge deck at the time the work was to be performed. There were important differences between the bridge deck depicted and the bridge deck at the time the demolition was being performed. Dugan and Marney discussed the as-built diagrams and agreed as to how Dugan would cut the barrier.

Hamilton did not perform an engineering survey. And at no time were Dugan and Corkhill presented with a written engineering survey of the structural integrity of the bridge or a demolition plan for the job. Dugan was unaware of any engineering survey. However, Dugan was aware of Staton's demolition plan and performed saw cutting activities consistent with the plan.

According to Dugan, the plan was to make a horizontal cut of the concrete rail barrier at the edge of the bridge along the full length of the bridge, followed by vertical cuts with a different saw to divide the barrier into smaller pieces that an excavator could detach and remove safely. The excavator was on site and manned by employees from a different company. Marney had control of the use of the excavator. The excavator was supposed to be used to brace or stabilize the barrier during the concrete cutting operation. However, the curb saw was so large that the excavator could not be used as anticipated. This left the cut portions of the barrier unbraced. In addition, the excavator was missing an attachment that was supposed to help brace the structure. No other method of bracing was provided. Regardless, Dugan and Corkhill began their concrete cutting operation.

Two WHH Nisqually employees were present on the roadway below the bridge to monitor and stop traffic on the road when the last cut was made. Carla Vandiver was a traffic control supervisor who was supervising one other flagger, Shelby King. Marney was responsible for calling Vandiver before American Concrete made the final cut.

4

Only Dugan, Corkhill, and Marney were present in the immediate concrete cutting area. Marney was responsible for overseeing the job, but Dugan stated that Marney was not allowed to operate the curb saw machine. Dugan made two complete horizontal cuts of four and eight inches deep. The concrete barrier remained stable during those cuts. A larger blade was used for the third and final horizontal cut. Approximately 50 feet into the cut, Dugan and Corkhill noticed slurry seepage. Dugan reduced the depth of the cut. After another 50 feet, Corkhill told Dugan to stop cutting because he saw the barrier rail move. Dugan, Corkhill, and Marney inspected the structure and Dugan told Corkhill that it was typical for a barrier rail to settle onto the bridge deck. Marney spoke to Dugan for the first time since the operation started, and he reached the same conclusion as Dugan regarding the barrier settling. Marney told Dugan to continue cutting.

As the concrete cutting operation proceeded, Vandiver and King continued to walk under the bridge several times while Vandiver waited for a phone call from Marney. Dugan and Corkhill saw that the flaggers were below them before the barrier fell. Vandiver was 50 feet away standing on the shoulder at the time the barrier fell off the bridge.

During the last cut, the barrier rail on the bridge deck fell onto the surface of the road below. No workers were injured when this happened, but a vehicle that happened to be driving on the road below was crushed and three people were killed.

*DLI Citation*

In October 2015, DLI issued a citation and notice to Hamilton after an inspection of the Bonney Lake jobsite. The citation listed three serious violations: (1) violation 1-1 alleged that Hamilton carried on the demolition operation of the concrete barrier without following procedures in the demolition plan and engineering survey in violation of WAC 296-155-040(1),

5

(2) violation 1-2 was for failure to ensure that workers carrying on a demolition operation prevented exposure to persons working on a lower level in violation of WAC 296-155-775(15), and (3) violation 1-3 was for failure to ensure that the concrete barrier was secured or braced to prevent collapse or failure during the cutting of the concrete barrier in violation of WAC 296-155-035(8). Each citation carried a monetary penalty of $4,900.

DLI also issued a citation to Staton for willful WISHA violations.

*Procedural History*

Hamilton appealed to DLI the violations identified in the citation. DLI decided to not reassume jurisdiction and the appeal was sent directly to the Board. The case was heard by an industrial appeals judge (IAJ).

Hamilton stipulated that two of its employees were exposed to the alleged hazards; that the violations, if proven, were properly characterized as "serious" under WISHA; and that the "severity" rating for purposes of calculating the proposed penalty should be at the "highest rating." Clerk's Papers at 33. Because of these stipulations, the only issues were whether Hamilton violated the cited standards at the worksite, and if so, whether the penalties for those violations were correctly calculated.

At the hearing, several witnesses testified to the facts described above, including Corkhill, Dugan, Vandiver, American Concrete employee Eric Hill, King, and Garrick. Vincent McClure also testified as Hamilton's expert.

In addition to the facts recited above, Dugan and Corkhill testified that they saw the flaggers who were on the road below the bridge before they cut the barrier. Both also testified that they did not observe any sort of bracing or securing of the barrier during their work. Dugan stated that he considered Marney to be in charge of the concrete cutting project.

6

Hill was the general manager for American Concrete. He testified that American Concrete is a subcontractor that specializes in concrete cutting. American Concrete did not bid for any portion of the Bonney Lake project and had no responsibility for the overall project. He acknowledged that Hamilton and American Concrete did not prepare an engineering survey for the project. Hill stated that Dugan and Corkhill were to follow Staton's plan for the job and if Dugan had any questions about how to perform his job, he was supposed to contact Staton.

McClure testified that he reviewed the as-built diagrams and demolition plan after the fact and noted that there were important differences between the documents and the bridge deck at the time the demolition was being performed. McClure testified that Dugan and Corkhill's actions were consistent with the demolition plan, but that the plan itself was not based on the actual construction of the bridge barrier rail that collapsed. He also explained that an engineering survey was different from a demolition plan.

The IAJ issued a proposed decision and order vacating the citation and notice in its entirety on the grounds that DLI failed to present a prima facie case establishing that Hamilton had violated any specific safety and health rules or a general duty to provide a safe work environment. DLI filed a petition for review, which the Board denied. The Board adopted the proposed decision and order.

DLI appealed the Board's decision and order to the superior court. The superior court issued an order affirming in part and remanding in part the Board's decision, which directed the Board to determine whether Hamilton had violated WAC 296-155-775(15) (violation 1-2), WAC 296-155-035(8) (violation 1-3), and WAC 296-155-775(1)..

On remand, the Board issued a decision and order finding that Hamilton had violated WAC 296-155-775(1) (renumbered as violation 1-1a), WAC 296-155-775(15) (violation 1-2),

and WAC 296-155-035(8) (violation 1-3). The Board reduced the penalty for each violation to $100 on the grounds that DLI failed to provide sufficient proof to calculate the penalty pursuant to WAC 296-900-140.

Both Hamilton and DLI appealed the Board's 2018 decision and order to the superior court. The appeals were consolidated.

The superior court affirmed the Board's 2018 decision and order regarding whether Hamilton committed three serious violations, but determined that the Board had erred in its penalty reductions. The court modified the penalties and remanded to the Board for Hamilton and DLI to present additional testimony, evidence, and argument regarding the adjustments to the gravity-based penalties. The court also determined that substantial evidence supported the Board's findings of fact except for finding of fact 3. That finding stated that Hamilton employees were aware of the demolition plan created by Staton and performed saw cutting activities consistent with the plan.

Hamilton appeals the superior court's order affirming the Board's order and decision regarding the three serious violations.

ANALYSIS

A.    APPLICABLE REGULATIONS

The purpose of WISHA is to "assure, insofar as may reasonably be possible, safe and healthful working conditions for every [person] working in the state of Washington" and "to create, maintain, continue, and enhance the industrial safety and health program of the state." RCW 49.17.010. DLI has statutory authority to adopt workplace safety regulations. RCW 49.17.040. DLI has done so in Title 296 WAC.

DLI has the authority to issue citations to an "employer" who violates the requirements of RCW 49.17.060. RCW 49.17.120(1). A "serious" violation exists "if there is a substantial probability that death or serious physical harm could result from a condition which exists, or from one or more practices, means, methods, operations, or processes which have been adopted or are in use in such workplace, unless the employer did not, and could not with the exercise of reasonable diligence, know of the presence of the violation." RCW 49.17.180(7).[1]

DLI bears the burden of proving a WISHA violation. *Ostrom Mushroom Farm Co. v. Dep't of Labor & Indus.*, 13 Wn. App. 2d 262, 272, 463 P.3d 149 (2020); *see also* WAC 263-12-115(2)(b), (c). To establish a serious violation of a WISHA safety regulation, DLI must prove "(1) the cited standard applies, (2) the requirements of the standard were not met, (3) employees were exposed to or had access to the violative condition, (4) the employer knew or through the exercise of reasonable diligence could have known of the violative condition, and (5) there is a substantial probability that death or serious physical harm could result from the violative condition." *Ostrom Mushroom*, 13 Wn. App. 2d at 272.

B. STANDARD OF REVIEW

In a WISHA appeal, we directly review the Board's decision – not the superior court's decision – based on the record before the agency. *Ostrom Mushroom*, 13 Wn. App. 2d at 271. We review the Board's findings of fact to determine whether substantial evidence supports them, and if so, whether the findings of fact support the conclusions of law. *Potelco, Inc. v. Dep't of Labor & Indus.*, 7 Wn. App. 2d 236, 243, 433 P.3d 513 (2018). Evidence is substantial if it is sufficient in quantity to persuade a fair-minded person of the truth of the declared premise. *Id.*

---

[1] RCW 49.17.180 has been amended since the events of this case transpired. The definition of "serious violation" was renumbered in 2021. Because these amendments do not affect the issues in this appeal, we cite to the current version of the statute.

When determining whether substantial evidence supports the factual findings, we view the evidence in the light most favorable to the party that prevailed before the Board. *Id.* at 243-44. On appeal, this court does not reweigh evidence. *Ostrom Mushroom*, 13 Wn. App. 2d at 271.

We liberally construe regulations promulgated pursuant to WISHA to protect workers from hazardous conditions at their place of employment. *Id.* at 272. DLI's interpretation of statutes and regulations are given substantial weight and will be upheld as long as the interpretation does not contradict legislative intent. *Id.*

C.   EMPLOYER LIABILITY

Hamilton argues that substantial evidence does not support the Board's determination that American Concrete was a subcontractor or was an "employer" for purposes of WISHA. Hamilton claims that there is no evidence that American Concrete had any control at the Bonney Lake jobsite nor did it create or control the hazard at the jobsite. We disagree.

1.   Legal Principles

Under WISHA, employers are responsible for the health and safety of their employees. *Potelco, Inc. v. Dep't of Labor & Indus.*, 191 Wn. App. 9, 30, 361 P.3d 767 (2015). RCW 49.17.020(4) defines "employer" as any corporation that "engages in any business, industry, profession, or activity in this state and employs one or more employees or who contracts with one or more persons, the essence of which is the personal labor of such person or persons." " 'Any entity that engages in any business and employs one or more employees is an employer for WISHA purposes.' " *Dep't of Labor & Indus. v. Tradesmen Int'l, LLC*, 14 Wn. App. 2d 168, 175, 470 P.3d 519 (2020), *review granted*, 196 Wn.2d 1036 (2021) (quoting *Martinez Melgoza & Assocs., Inc. v. Dep't of Labor & Indus.*, 125 Wn. App. 843, 848, 106 P.3d 776 (2005)).

RCW 49.17.060 requires that employers comply with two distinct duties. *Afoa v. Port of Seattle*, 176 Wn.2d 460, 470, 296 P.3d 800 (2013). First, RCW 49.17.060(1) establishes a general duty to furnish a workplace that is "free from recognized hazards that are causing or likely to cause serious injury or death to [their] employees." *Id.* at 470. Second, RCW 49.17.060(2) establishes a specific duty for employers to "comply with the rules, regulations, and orders promulgated under [WISHA]." *Id.* at 471. This second duty applies to "*any* employee who may be harmed by the employer's violation of the safety rules," regardless of any employer-employee relationship. *Id.* In other words, one employer may be liable under WISHA for endangering the employees of another employer when multiple employers are working at the same worksite. *Id.* at 472; *see also Martinez Melgoza*, 125 Wn. App. at 848-49.

Even when a corporation meets the broad definition of "employer" under WISHA, it is not necessarily liable for a WISHA violation. An employer can be held liable for WISHA violations if it exercises sufficient control over the worksite. *See Afoa*, 176 Wn.2d at 472.

When the contractor at a worksite obtains leased or temporary workers from another company, the question presented is whether the lessor company or the lessee company is the "employer" of those workers. *See generally Tradesmen Int'l*, 14 Wn. App. 2d at 170-71; *Potelco*, 191 Wn. App. at 14. Courts apply a seven-factor "economic realities test" to determine who is an employer for purposes of a WISHA violation. *Tradesmen Int'l*, 14 Wn. App. 2d at 177-78; *Potelco*, 191 Wn. App. at 30-31. Under the economic realities test, "[t]he key question is whether the employer has the right to control the worker." *Potelco*, 191 Wn. App. at 31.

2. Subcontractor vs. Leased Worker

The Board made a finding that Staton hired Hamilton as a concrete cutting subcontractor. Hamilton assigns error to this finding, arguing that it was not a subcontractor because Staton had

control of the cutting operation. Hamilton appears to argue that Dugan and Corkhill were leased or temporary employees rather than subcontractors, and therefore the economic realities test must be used to determine their employer for WISHA purposes. We conclude that substantial evidence supports the Board's finding that Hamilton was a subcontractor and not the supplier of leased employees, and therefore that the economic realities test does not apply.

All the cases in which courts have applied the economic realities test in the WISHA context have involved general laborers provided by an employment agency or a staffing company on a temporary basis. *See*, *e.g.*, *Tradesmen Int'l*, 14 Wn. App. 2d at 171-72 (construction worker); *Potelco*, 191 Wn. App. at 14 (road flaggers).

Hamilton's subsidiary American Concrete, who dispatched Dugan and Corkhill, is not an employment agency. Hill testified that American Concrete is a subcontractor that specializes in concrete cutting. Contractors hired American Concrete to perform specific concrete cutting jobs rather than to obtain laborers for a job to be performed by someone else.

In addition, American Concrete did not merely provide general laborers. An essential part of American Concrete's job was providing specialized equipment – the large curb saw, the vacuum truck, and the water tank. This equipment was necessary to cut the concrete rail barrier. And Dugan was dispatched not merely to do whatever work Staton needed, but because he had specialized skill and expertise in the operation of the curb saw. Corkhill's specific function was to operate the vacuum truck to suck up slurry the curb saw generated.

Staton hired American Concrete to perform a specific task using American Concrete's specialized equipment to remove the concrete rail barrier. Using its expertise, American Concrete selected the appropriate employees to dispatch and the equipment necessary to complete the job. We conclude that the details of this arrangement support the Board's finding

that American Concrete was a subcontractor.[2]  There is no evidence supporting Hamilton's

contention that the economic realities test should apply because American Concrete merely

supplied leased or temporary workers to Staton.

As a subcontractor, there is no question that Hamilton/American Concrete falls within

WISHA's definition of "employer."  The record shows that Hamilton is a business entity with at

least one employee, as required under RCW 49.17.020(4).

3.    Borrowed Servant Doctrine

Hamilton argues that the Board erred in declining to apply the borrowed servant doctrine

applied in personal injury cases to determine whether it was liable under WISHA as an

employer.  We disagree.

The borrowed servant doctrine is an exception to the tort doctrine of respondeat superior,

under which an employer is vicariously liable for the torts of its employees committed within the

scope of their employment.  *Wilcox v. Basehore*, 187 Wn.2d 772, 783, 389 P.3d 531 (2017).  If a

general employer loans its employee to a borrowing employer, the general employer can avoid

liability for the employee's actions.  *Id.*  The borrowing employer must have complete control

over the employee for the injury-causing transaction.  *Id.*

Hamilton claims that the borrowed servant doctrine is applicable because DLI historically

has cited general contractors for safety violations committed by its subcontractors in personal

injury cases, such as in *Stute v. P.B.M.C., Inc.*, 114 Wn.2d 454, 788 P.2d 545 (1990).  But the

borrowed servant doctrine is a tort principle that has been applied in tort cases.  No case has

---

[2] Hamilton notes that there was no written contact between Hamilton and Staton.  But Hamilton presents no argument or authority supporting the proposition that a subcontractor relationship requires a written contract.

applied the borrowed servant doctrine to determine whether a particular entity is an "employer" under WISHA. We decline to do so here.[3]

4.   Liable Employer Under WISHA

Hamilton argues that even if it falls within WISHA's definition of "employer," it is not subject to WISHA liability because Staton was in control of its operations at the worksite. Hamilton claims that American Concrete lacked control over the worksite and merely followed the demolition plan that Staton provided. We disagree.

a.   Legal Principles

"Washington courts have assessed an employer's liability for WISHA violations by considering the employer's supervisory authority and control over the worksite and whether the employer controlled or created the worksite's dangerous condition." *Martinez Melgoza*, 125 Wn. App. at 850. An employer at a multiple employer worksite is liable under WISHA "if the violating employer was a creating, exposing, correcting, or controlling employer." *Id.* And DLI "may cite multiple employers for violating workplace safety standards." *Potelco*, 191 Wn. App. at 30.[4]

---

[3] Hamilton also argues for the first time in its reply brief that it was not an employer as defined by RCW 49.17.020(4) because Dugan did not provide "personal labor," citing *White v. Department of Labor & Industries*, 48 Wn.2d 470, 474, 294 P.2d 650 (1956). We decline to address this argument because Hamilton failed to raise it in its opening brief. *See Grange Ins. Ass'n v. Roberts*, 179 Wn. App. 739, 771, 320 P.3d 77 (2013); RAP 10.3(c).

[4] Hamilton argues for the first time in its reply brief that American Concrete is not an employer under the "common law of agency" or "right to control" test stated in *Nationwide Mutual Insurance Company v. Darden*, 503 U.S. 318, 323-24, 112 S. Ct. 1344, 117 L. Ed. 2d 581 (1992). Again, we decline to consider this argument. But the *Darden* test, which involves federal law, appears generally consistent with Washington law as expressed in *Martinez Melgoza*, 125 Wn. App. at 853.

These rules apply to subcontractors at a multiple employer worksite: " '[l]iability may arise if the subcontractor contractually assumed responsibility for safety precautions at the worksite or is shown to have been in control of the method of performing the work.' " *Martinez Melgoza*, 125 Wn. App. at 851 (quoting *Jones v. Halvorson-Berg*, 69 Wn. App. 117, 124, 847 P.2d 945 (1993) (brackets in original).

In *Martinez Melgoza*, the court held that an asbestos consultant exercised sufficient control over the worksite to make it liable for WISHA violations at a multiple employer worksite. 125 Wn. App. at 845, 853. The consultant provided asbestos consulting services on a Port of Seattle asbestos abatement project under various contracts that granted final decision-making responsibility to the Port. *Id.* at 845-46. The court determined that regardless of the contract provisions, the consultant still was liable for the WISHA violations because it "exercised a great deal of control over the worksite in *actual practice*." *Id.* at 851. For example, several witnesses testified that the consultant had total authority over asbestos abatement contractors and directed workers on how to proceed at the jobsite. *Id.* at 851-53.

    b.    Analysis

Here, Staton was in control of the overall demolition project, provided the faulty demolition plan, and supervised Dugan's and Corkhill's work. So there is no question that Staton was subject to WISHA liability, and in fact Staton received a citation. But as noted, DLI can cite multiple employers for the same hazard. *Potelco*, 191 Wn. App. at 30. The question is whether Hamilton *also* is subject to WISHA liability.

First, the evidence shows that American Concrete created the hazard that resulted in the WISHA violations. Dugan, American Concrete's employee, was the person who used the curb saw to cut the concrete barrier that ultimately fell to the road below. Dugan began the cutting

15

operations without ensuring that an engineering survey had been performed. Dugan continued cutting even though other people were walking under the bridge. And Dugan continued cutting even though the barrier obviously was not secured or braced. As a result, American Concrete exposed other workers to harm.

Second, the evidence shows that American Concrete had at least partial control over the concrete cutting operation that created the hazard. American Concrete selected and provided the equipment necessary to cut the concrete barrier. Only Dugan was authorized to operate the curb saw, and only Dugan did operate the saw. Dugan decided how deep the cuts should be after consulting the as-built diagrams, and had no interaction with Marney, the Staton supervisor, during the three horizontal cuts that he made. In fact, the first time that Dugan talked to Marney during the actual concrete cutting operation was after Corkhill told Dugan to stop cutting when he saw the rail move. Although Marney ultimately told Dugan to finish cutting the barrier, Dugan explained that he had come to the conclusion that it was typical for the barrier to settle and that Marney agreed with him. And Dugan's description of what happened during the actual concrete cutting operations suggests that he was exercising his own specialized knowledge to complete the concrete cutting job.

Hamilton argues that Staton, through Marney, had complete control over Dugan and Corkhill. It relies on testimony from Garrick to support the contention that Hamilton completely relinquished control to Marney. There is no question that Marney directed and supervised the work of Dugan and Corkhill on the demolition project. But there also is no question that Dugan controlled the " 'method of performing the work.' " *Martinez Melgoza*, 125 Wn. App. at 850 (quoting *Jones*, 69 Wn. App. at 124). Dugan operated the curb saw and made the cuts, using his expertise and experience. Although Marney may have been the site supervisor, the record shows

16

that similar to *Martinez Melgoza*, American Concrete had significant control of the concrete cutting operations in actual practice. Stated differently, Staton had control over the work that needed to be done, but Dugan had control over how the work was to be performed.

Hamilton also argues that American Concrete had no ability to avoid the WISHA violations because Staton controlled the project. But as a subcontractor in charge of the equipment necessary to complete the job, American Concrete had ultimate control. Dugan may not have had the ability to prepare an engineering survey, to control the activities of the flaggers below, or to secure or brace the barrier he was cutting. But he simply could have refused to begin or continue the cutting operations until he saw an engineering survey, everyone was cleared below the bridge, and the barrier was secured or braced.

Finally, Hamilton argues that imposing liability for the cited WISHA violations is contrary to the underlying purpose of the federal Occupational Safety and Health Act of 1970 (OSHA) and WISHA to hold entities responsible for the hazards that are within their control. As a result, it claims that the Board's decision to affirm DLI's citations creates strict liability on American Concrete. But as noted above, American Concrete did have control over the manner in which the work was performed. And imposing liability here does not create strict liability because DLI still had the burden to prove all five elements of a serious WISHA violation, including knowledge of the violative condition. *Potelco*, 191 Wn. App. at 33-34.

We conclude that substantial evidence supports the conclusion that Hamilton was subject to liability under WISHA.

D.    VIOLATION OF WISHA PROVISIONS

Hamilton does not expressly argue that it did not violate the WISHA provisions listed in the DLI citation, but that argument is implied and is weaved throughout Hamilton's briefs.

Hamilton's argument seems to be that the violations were caused by the fault of others and the defective demotion plan. We disagree.

1.   Violation 1-1a

Violation 1-1a was brought under WAC 296-155-775(1),[5] which states that "[p]rior to permitting employees to start demolition operations, a competent person must perform an engineering survey of the structure" to determine, among other things, "the possibility of unplanned collapse of any portion of the structure." The regulation also requires that a copy of the engineering survey be maintained at the job site. WAC 296-155-775(1)(b). This violation was based on Hamilton's failure to perform the concrete cutting operations without the guidance of a written engineering survey. The Board upheld this violation.

Here, there was no evidence that Hamilton, Staton, or any other employer involved at the Bonney Lake worksite had prepared an engineering survey. Dugan and Corkhill both testified that they did not personally see any engineering survey.

Hamilton argues that violation 1-1a should not be affirmed because WAC 296-155-775(1) does not require the actual engineering survey to be shown to all workers involved in the demolition. But this argument is misplaced because it ignores the clear language in WAC 296-155-775(1), which requires an engineering survey be performed *before* employees start demolition operations and to provide written evidence that such an engineering survey has been performed.

Hamilton also argues that Dugan merely was following Staton's demolition plan and cannot be faulted for not knowing that the demolition plan was inadequate. But it is immaterial

---

[5] WAC 296-155-775 has been amended since 2015, but the amendments did not affect the provisions at issue here. Therefore, this court cites to the current version of the WAC.

that Dugan reviewed an inadequate demolition plan because WAC 296-155-775(1) requires a written *engineering survey*. And McClure testified that an engineering survey is different from a demolition plan. Therefore, we reject Hamilton's argument that an inadequate demolition plan relieves it of any liability for violation 1-1a.

We conclude that substantial evidence supports the Board's conclusion of law that Hamilton committed a serious violation of WAC 296-155-775(1).

2.    Violation 1-2

DLI issued violation 1-2 under WAC 296-155-775(15), which prohibits employers from allowing workers to "carry on a demolition operation which will expose persons working on a lower level to danger." This violation was based on Vandiver and King's continued presence under the bridge and three other workers who were on the lower level containment area as the concrete cutting operations occurred. The Board upheld this violation.

Here, there was undisputed evidence that Vandiver and King walked back and forth under the overpass while Dugan and Corkhill were engaged in cutting operations. Dugan and Corkhill testified that they saw the flaggers down below them.

Hamilton argues that there were no American Concrete employees who were exposed to the hazard and that American Concrete did not create any hazard or have any control over the flaggers below. But under RCW 49.17.060(2), Hamilton's specific duty to comply with WISHA regulations runs to "*any* employee who may be harmed by the employer's violation of the safety rules," including Vandiver and King who worked for the general contractor. *Afoa*, 176 Wn.2d at 471. Further, Hamilton created the hazard because it was in control of the curb saw as stated above and could have taken measures to prevent the violative condition by informing Marney to clear the area below.

We conclude that substantial evidence supports the Board's conclusion of law that Hamilton committed a serious violation of WAC 296-155-775(15).

3.    Violation 1-3

DLI issued violation 1-3 under WAC 296-155-035(8), which requires employers to "secure or brace the component parts of structures to prevent collapse or failure." This violation was based on Hamilton's failure to secure or brace the barrier it was working on during the concrete cutting operation. The Board upheld this violation.

There was undisputed evidence that the concrete barrier that Dugan was cutting was not secured or braced. As stated above, Dugan explained that the original plan was to have the excavator hold the barrier pieces in place during the concrete cutting operations, but that the excavator ultimately was not utilized when Dugan began to cut the concrete barrier.

Hamilton again argues that it cannot be held liable for violation 1-3 because it was not aware of the deficient demolition plan. It also argues that it was not responsible for operating the excavator that was supposed to provide support for the barrier being cut. But the inadequacy of the demolition plan or who was responsible for providing the excavator are separate issues from the plain requirement under WAC 296-155-035(8) to brace or secure the relevant parts of the structures to prevent collapse or failure.

We conclude that substantial evidence supports the Board's conclusion of law that Hamilton committed a serious violation of WAC 296-155-035(8).

E.    KNOWLEDGE OF VIOLATIVE CONDITIONS

Hamilton argues that there is insufficient evidence to show that Hamilton had knowledge of the alleged violative conditions. We disagree.

1.   Legal Principles

To prove a serious violation under WISHA, DLI must show that the employer knew or by exercising reasonable diligence could have known of the violative condition. RCW 49.17.180(7); *Ostrom Mushroom*, 13 Wn. App. 2d at 272. Whether an employer has exercised reasonable diligence involves consideration of factors such as the employer's obligations to inspect the work site, to anticipate potential hazards that its employees may encounter, and to take measures to prevent a violative condition from occurring. *Bayley Constr. v. Dep't of Labor & Indus.*, 10 Wn. App. 2d 768, 783, 450 P.3d 647 (2019), *review denied,* 195 Wn.2d 1004 (2020).

Further, an "employer has constructive knowledge of a hazardous condition if it is readily observable or in a conspicuous work site location." *Id.* Therefore, DLI can show constructive knowledge if the violation was in plain view. *Potelco*, 7 Wn. App. 2d at 244. A violation is in plain view when any bystander easily can observe the violation. *Id.* at 245.

Knowledge may be imputed to an employer when a supervisor has actual or constructive knowledge of a safety violation. *Id.* at 244. An employee need not hold the official title of foreman or supervisor to be considered a supervisor for the purposes of imputing knowledge onto the employer as long as the employee has significant control over the actual work in practice and the ability to stop work when faced with clear safety hazards. *See Mountain States Contractors, LLC v. Perez*, 825 F.3d 274, 284-85 (6th Cir. 2016).[6]

In *Mountain States Contractors*, the Sixth Circuit held that substantial evidence supported the administrative law judge's finding that a construction contractor had both actual

---

[6] Federal decisions that interpret OSHA may inform us when interpreting WISHA. *Shimmick Constr. Co. v. Dep't of Labor & Indus.*, 12 Wn. App. 2d 770, 778, 460 P.3d 192 (2020).

and constructive knowledge of a crane's broken boom cable before the cable snapped and caused the boom to fall onto the adjacent highway. *Id.* at 277, 286. Two crane operators, one of whom was also the site foreman, noted that the cable needed to be replaced in their daily inspection forms several times over the span of a few months. *Id.* at 280. A third crane operator also eventually noted that the boom cable needed to be replaced. *Id.* The employees continued to operate the crane despite the cable's poor condition. *Id.* at 280-81.

In addition to imputing knowledge onto the employer based on the foreman's actual knowledge of the boom cable's poor condition, the court separately concluded that the other two crane operators had actual knowledge that also could be imputed onto the employer. *Id.* at 285. The court stated that the two crane operator in essence were "supervisors" for purposes of imputing knowledge based on the fact that they had complete responsibility for monitoring the crane's condition, had minimal supervision over the operation of the crane, and could have halted operations based on the clear safety hazards related to the poor cable conditions. *Id.*

2. Violation 1-1a

The record shows that Hamilton had actual or constructive knowledge that no engineering survey had been completed before Dugan began cutting the barrier and that there was no written evidence that there was a completed engineering survey in violation of WAC 296-155-775(1). Hill testified that Hamilton did not create an engineering survey before starting the concrete cutting operation. Dugan and Corkhill testified that they did not see an engineering survey for the Bonney Lake jobsite. Further, Garrick in the exercise of due diligence could have asked a Staton employee whether there had been an engineering survey completed for the requested concrete cutting job during his initial contact with Staton. If he had done so, he would have discovered that no engineering survey had been performed.

We conclude that substantial evidence supported the Board's implied finding that Hamilton had knowledge that there was no engineering survey and no written evidence of an engineering survey before Dugan and Corkhill began cutting the barrier in violation of WAC 296-155-775(1).

3. Violation 1-2

Here, there was evidence that the flaggers were walking in plain view under the bridge, establishing constructive knowledge of the hazardous condition posed by cutting the barrier. Vandiver and King both testified that they walked under the bridge several times while the cutting operations were happening. In addition, there was evidence of actual knowledge because Dugan and Corkhill testified that they saw that the flaggers were down below them before the barrier fell. Further, Dugan was a supervisor in actual practice for purposes of imputing knowledge to Hamilton based on his complete control over the operation of the curb saw and his supervision of Corkhill's work. *Mountain States Contractors*, 825 F.3d at 285. Not only could Dugan have informed Marney about the presence of other employees below the concrete cutting operation, but Dugan could have refused to operate the curb saw until the area below was clear.

We conclude that substantial evidence supported the Board's implied finding that Hamilton had knowledge that the concrete cutting operations exposed persons working on a lower level to danger in violation of WAC 296-155-775(15).

4. Violation 1-3

The testimony of Dugan and Corkhill shows that they had actual knowledge that the barrier was not secured or braced during their concrete cutting operation. They testified that the barrier was not braced or secured at all while they were working on it. Dugan further explained that Corkhill saw the rail move and told him to stop cutting, but that he continued to cut after he

and Marney decided to continue with the concrete cutting operations. And as stated above, actual knowledge can be imputed onto Hamilton because Dugan was a supervisor in actual practice and could have refused to operate the curb saw once he realized that the excavator could not be utilized for its intended purpose. Further, there was evidence of constructive knowledge because the absence of bracing was in plain view.

We conclude that substantial evidence supported the Board's implied finding that Hamilton had knowledge that the component parts of the bridge and concrete barrier were not secured or braced in violation of WAC 296-155-035(8).

F.     FINDING OF FACT 3

Hamilton argues that the superior court erred in determining that substantial evidence does not support the Board's finding of fact 3, which states that Hamilton employees were aware of the demolition plan created by Staton and performed saw cutting activities consistent with the plan.

But the issue of whether the superior court erred in determining that substantial evidence does not support the Board's finding of fact 3 is immaterial because we review the Board's finding directly. *See Ostrom Mushroom*, 13 Wn. App. 2d at 271. And neither Hamilton nor DLI assigns error to the Board's finding of fact 3 on appeal. Accordingly, we decline to address Hamilton's argument.

CONCLUSION

We affirm the superior court's order affirming the Board's 2018 decision and order.

No. 54578-1-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

MAXA, J.

We concur:

WORSWICK, P.J.

CRUSER, J.